SECRETARY OF HEALTH AND MENTAL HYGIENE *v.* JESSE T. CROWDER

[No. 251, September Term, 1979.]

*Per Curiam Order August 13, 1979.*

*Opinion Filed September 6, 1979.*

The cause was argued before GILBERT, C. J., and MORTON and COUCH, JJ.

*Standish McCleary, III, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Harry T. deMoll,* with whom were *Blomquist & deMoll, P.A.* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

On August 13, 1979, following oral argument in this case, we issued the following per curiam order:

> "This cause, having come before this Court on argument after an order of advancement, it is this 13th day of August, 1979, by the Court of Special Appeals of Maryland,
>
> ORDERED, that the judgment hereinbefore entered by the Circuit Court for Frederick County be, and the same is hereby, reversed.
>
> The reasons for this per curiam order to be stated in an opinion to be filed at a later date. Costs to be paid by appellee. The mandate shall issue forthwith."

We now explain why we took that action.

This is the story of Treasure Mountain. It is the saga of Jesse T. Crowder's venture into real estate development of

his own small tract of property and his entanglement in the regulations of the Maryland Department of Health and Mental Hygiene.[1] The complex web of governmental rules, the Department's denial of permission to use septic tank sewage in the venture, together with the resultant administrative appeals, must have at times seemed to Crowder to have removed all expectation of "Treasure" from the Mountain. Indeed, "Treasure Mountain" might be better named "Heartbreak Hill." The Circuit Court for Frederick County cut through the strands of the regulatory web, reversed the decision of the Secretary of Health and Mental Hygiene as well as that Department's Board of Review, and placed its judicial stamp of approval on Crowder's project.

Unmistakably aggrieved by the circuit court's action, the Secretary appealed. We, after discussion with counsel for the parties litigant, *sua sponte* advanced the matter for hearing.

The Secretary vigorously asserts to us that "the denial of subdivision approval" by the agency over which he presides was "in accordance with legally sufficient regulatory standards," and that the denial was "supported by substantial evidence."

The facts giving birth to this appeal commenced with plans to subdivide sixteen acres of land located in Frederick County into sixteen residential building lots.[2] Four of the lots failed to pass the necessary percolation test,[3] and two lots were

---

1. Code of Maryland Regulations (COMAR), Title 10, Department of Health and Mental Hygiene, Subtitle 17, ch. 02, .01 E provides:

"E. Where public water supply and sewage disposal systems are not available, any person contemplating the construction of a building for human occupancy or use, or addition to or alteration of any existing water supply or sewage disposal system shall, previous to beginning any construction, make application to the approving authority for a written permit to make the desired installation. The length of time a permit is to run shall be specified in the permit and may not exceed 3 years. The permit shall become inoperative at the expiration of the period of time prescribed, without notice to that effect having been given by the approving authority."

2. The original plat received "preliminary" approval from the Frederick County Planning Commission on December 14, 1976.

3. COMAR, 10.17.02.02 H defines "percolation test" to mean "the determination of the suitability of an area for subsoil effluent disposal by testing for the rate at which the undisturbed soil in an excavated pit of

combined into one because of the slope of the lots. The percolation tests were relatively fast.[4] As a result of the tests, the subdivision was reduced to eleven lots on the final revised plat that was submitted to the Supervisor of the Environmental Health Services of the Frederick County Health Department. The Supervisor disapproved the plat and Crowder set out on his journey to court.

---

standard size will absorb water per unit of surface area." Put in simpler terms, a percolation test measures the rate at which a given quantity of water will seep from a hole of specific size that has been dug in the ground for that purpose.

4. The results of the "perk" tests are set out in the "SYNOPSIS OF CASE, FINDINGS OF FACTS, QUESTIONS PRESENTED, STATUTES AND REGULATIONS INVOLVED, CONCLUSIONS AND RECOMMENDA-TION" of a hearing officer designee of the Secretary of Health and Mental Hygiene. We quote therefrom:

"Testimony by Thomas Mohler, Jr., based upon his method of performance of percolation testing resulted in the following: (They are entered here as results and not as acceptance of failing or passing.) . . .

Lot #1 — *failed* percolation testing — no perk and was not included on Revised Preliminary Plat . . .

Lot #2 — gave a one minute perk. This was said to meet the standard and *passed.*

Lot #3 — one minute perk, said to meet the standard and *passed.*

Lot #4 — one minute perk — *passed.*

Lot #5 — forty (40) second test then retested to 1½ minute and this was rounded out to two minutes — *passed.*

Lot #8 — 3 minute perk . . . not retested — *passed* — had a problem of 25 percent slope or more. The septic system area was too close to this slope and Lot 8 and 9 on preliminary plot . . . were combined.

Lot #9 — first test was 4 minute perk and second was 8 minute perk — *passed.*

Lot #10 — first perk was $7/8$ inches in 30 minutes of testing. The next day on February 15, two other test holes produced 4 minute tests and were *passed.*

Lot #11 — first test was 40 seconds retested and resulted in two minute test when rounded off *passed.*

Lot #12 — tested for tile fields after failing the pit test. The tile field test was then averaged out to declare 2 minute and *passed.*

Lot #13 — did *not pass* — exclude the sidewalls — were very wet. . . .

Lot #14 — testing was averaged to 3 minutes.

Lot #15 — did *not pass*

Lot #16 — did *not pass*"

For reasons not apparent to us, the test results for Lots 6 and 7 are not included.

First he appealed to the Deputy State Health Officer of Frederick County. Following a lack of success at that level, Crowder appealed to the Secretary of the Maryland Department of Health and Mental Hygiene. The Secretary designated a hearing officer to conduct the hearing and make recommendations to the Secretary. Upon receipt of the hearing officer's findings and recommendations, the Secretary affirmed the Deputy State Health Officer's disapproval of the subdivision plan. Crowder then appealed to the Board of Review of the State Health and Mental Hygiene Department.[5] Following oral argument, the Board of Review affirmed the order of the Secretary and adopted the findings of fact and conclusions of the hearing officer. Once more Crowder appealed. He sought relief in the Frederick County Circuit Court. That tribunal agreed with Crowder. It found that the hearing officer's findings of fact were not supported by the record before her, and that "there was no evidence in the case that could reasonably sustain the decision" of the Secretary. Accordingly, the court reversed the Secretary and "approved" the subdivision.

Before we begin our discussion of the law, certain fundamental principles applicable to appeals from administrative agencies must be recalled:

1. Judicial review of decisions made by an administrative board is narrow in scope because of the recognized expertise of the board in a particular field of endeavor. *Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979); *Finney v. Halle,* 241 Md. 224, 241, 216 A.2d 530, 539 (1966).

2. Decisions of administrative boards carry a presumption of validity and will not be disturbed on appeal if there is a showing within the record of substantial evidence to sustain the findings. *Heaps v. Cobb,* 185 Md. 372, 378-79, 45 A.2d 73, 76 (1945); *Commissioner v. Cason,* 34 Md. App. 487, 499, 368 A.2d 1067, 1074, *cert. denied,* 280 Md. 728 (1977); *Toland v.*

---

5. If the reader is intent on tracing the methodology of proceedings before the Secretary, he or she should read Clinton Com. Hos. v. Md. Comp. Health, 31 Md. App. 265, 355 A.2d 775 (1976).

*State Board of Education,* 35 Md. App. 389, 395-96, 371 A.2d 161, 164-65 (1977).

3. State administrative "agencies are created in order to perform activities which the Legislature deems desirable and necessary" to further the public health, safety, welfare, and morals. *Department of Natural Resources v. Linchester,* 274 Md. 211, 222, 334 A.2d 514, 522 (1975); *Commissioner v. Cason, supra.*

4. With or without legislative enactment, courts have an inherent constitutional duty to review, within limits,[6] decisions of administrative bodies. *Department of Natural Resources v. Linchester, supra; Baltimore Import Car v. Maryland Port Authority,* 258 Md. 335, 342-43, 265 A.2d 866, 869-70 (1970); *Commissioner v. Cason, supra.*

5. The powers vested in the courts, by statute or inherence, to review administrative decisions does not carry with it the right to substitute its fact finding process for that of an agency. *Oxon Hill Recreation Club v. Water Resources Administration,* 281 Md. 110, 114, 375 A.2d 567, 569 (1977); *Insurance Commissioner v. National Bureau,* 248 Md. 292, 309-10, 236 A.2d 282, 291-92 (1967); *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 445, 168 A.2d 390, 391 (1961); *Toland v. State Board of Education, supra; Nelson v. Real Estate Commission,* 35 Md. App. 334, 344-45, 370 A.2d 608, 615, *cert. denied,* 280 Md. 733 (1977); *Commissioner v. Cason, supra. See also,* Prof. E. A. Tomlinson, *Constitutional Limits on the Decisional Powers of Courts and Administrative Agencies in Maryland,* 35 Md. L. R. 414 (1976).

6. The court will correct illegal, arbitrary, and unreasonable acts of the administrative agencies "because those acts are not based on substantial evidence." *Snowden v. Mayor and City Council of Baltimore, supra,* 224 Md. at 445; *Commissioner v. Cason, supra.*

7. The court may not set aside a decision of an administrative agency merely because the court might weigh

---

6. State Department of Assessments and Taxation v. Clark, 281 Md. 385, 402, 380 A.2d 28, 38 (1977); Board of Medical Examiners v. Steward, 203 Md. 574, 580-81, 102 A.2d 248, 251 (1954); Prince George's County v. Fahey, 28 Md. App. 312, 316, 345 A.2d 102, 105 (1975).

the evidence differently. *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 476, 84 A.2d 847, 851 (1951). *See also Board v. Oak Hill Farms,* 232 Md. 274, 192 A.2d 761 (1963).

An excellent and relatively brief summary of the functions of the courts in reviewing a decision of an administrative agency was penned by Judge Jerrold V. Powers for this Court in the *Cason* case:

> "A reviewing court may, and should, examine any inference, drawn by an agency, of the existence of a fact not shown by direct proof, to see if that inference reasonably follows from other facts which are shown by direct proof. If it does, even though the agency might reasonably have drawn a different inference, the court has no power to disagree with the fact so inferred.
>
> A reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by permissible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion.
>
> A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact." 84 Md. App. at 508.

We turn now to the case *sub judice.*

While the hearing examiner's findings are not, in our view, as factually comprehensive as they should have been and, thus, invited the circuit court's reversal, the record, when reviewed, shows that the examiner was correct, even if for the wrong reason.

There was evidence that, although the majority of the lots passed the percolation test,[7] the "rock formulation" in the area where the septic systems were to be located would not fulfill the expectations of a septic system. In short the sewage would not be properly attenuated before it reached ground water.

Mr. Robert T. Dutrow, Supervisor of the Environmental Health Department for Frederick County, testified that he had been performing that "sort of work" for "[n]ineteen and a half years." He personally examined Treasure Mountain on several occasions. It was Mr. Dutrow's judgment that the septic system was not satisfactory if there were to be wells for water rather than a public water system. Dutrow believed that the proposed sewerage system might result in the infiltration of the ground water. He opined that it was the Health Department's job "to do its utmost to protect the public health and not wait until a contamination exists." Dutrow said that in an area such as that of Treasure Mountain, with its "fast percolation" that "there is more possibility for the water supply to be contaminated. . . ." The witness further stated that with a rocky soil structure such as here that septic system's effluent is "more apt to reach the water supply in an unfiltered state." He repeated that in his "opinion" there was a possibility of contamination of the water supply if the septic system as proposed was put on the lots. Dutrow also noted that other developments in the area had experienced "problems" with "contaminated water."

Another witness, Mr. Harry F. Sandberg, told the hearing examiner that he was "a Regional Consultant with the Environmental Health Administration, State Health Department." Mr. Sandberg testified that a fast percolation rate "in a fractured rock area [such as that at Treasure Mountain]" is essentially because of channery material. "Channery material," Mr. Sandberg defined as "cobblestones." He expressed the opinion that when "you have these various fast rates [for percolation], you are not going to get the renovation [of waste] and that sewage is

---

7. See n. 3, supra.

essentially going to get into the ground water in inner spaces of the rocks without any attenuation." The witness went on to say that:

> "I believe that if the subdivision was [*sic*] built, I think [that] within a reasonable period of time we would have problems with the wells because there is not going to be any renovation. The sewage is going to get into the inner spaces of the rock. The fractures [in the rocks] are hydrologically connected. It doesn't matter where the wells are. If you don't have that renovation of the sewage, then you can't be sure that the quality of the water will be of a potable [8] quality."

We think the reasonable inference to be drawn from the testimony of Messrs. Dutrow and Sandberg is that because of the strata of the soil, there is a definite possibility that the proposed septic systems will contaminate the proposed wells with unattenuated human waste.

The trial judge saw the record as not containing the necessary substantial evidence to support the Secretary's findings. We, however, view the record differently. We think that the testimony of Messrs. Dutrow and Sandberg was sufficient to satisfy the substantial evidence test applicable to proceedings before administrative bodies. At minimum, the issue was "fairly debatable." In our opinion, the circuit court erred in holding that there was no such evidence. It appears that the circuit judge did not believe the State's witnesses, or else he could not have reached the conclusion that he did. In any event it is clear to us that the judge substituted his judgment for that of the agency, and that he may not do.

Crowder suggests, indeed, he urges, that we hold that when the percolation test is passed, it is unreasonable for the Department of Health to deny a permit. The "perk test," he advances, satisfies the rule and there is nothing else for the Department to do but ministerially issue the necessary

---

8. " 'Potable water' means water which is safe for human consumption." COMAR 10.17.02.02 J.

permit. We, however, have an entirely different point of view.

COMAR 10.17.03.03 A provides:

> *"In all subdivisions, individual water supply and sewage disposal facilities may be permitted when in conformance with the county plan and where the following acceptable physical conditions are present: topography, soil types, surface and subsurface drainage, and the absence of a fluctuating high water table.* These determinations shall be based upon available information which shall include the history of individual water supply and individual sewerage systems, information obtained from the soil survey for the jurisdiction, standard percolation tests, available geologic and hydrologic data and any other information which may be available." (Emphasis supplied.)

The rule makes unmistakable that the passing of the percolation test is not the end of the matter. It is only one of the factors, among many, to be considered. Moreover, in those instances where a preliminary plan is submitted by the developer, a subdivision *"may not be considered, where, in the opinion of the approving authority, the infiltration of individual sewerage system wastes may result in the contamination of the ground water."* COMAR 10.17.03.02 A. (Emphasis supplied.) A reference to the testimony of Messrs. Dutrow and Sandberg, above, indicates that the "approving authority" was of the opinion that the individual sewerage systems as proposed by Crowder might result in contamination of the ground water. That testimony, if believed, justified the Department's refusal to issue the necessary permits. The hearing officer, Secretary, and Board of Review did not err in affirming that Department's declination to issue the permit. The circuit court erred in reversing that decision.

> *Judgment reversed.*
> *Costs to be paid by appellee.*