501 A.2d 1324

# DOCTORS' HOSPITAL OF PRINCE GEORGE'S COUNTY

### v.

# MARYLAND HEALTH RESOURCES PLANNING COMMISSION, et al.

### No. 318, Sept. Term, 1985.

Court of Special Appeals of Maryland.

Jan. 8, 1986.

658

Arvin E. Rosen (William L. Siskind and Siskind, Burch, Grady & Rosen, on the brief, Baltimore, of Counsel, Leslie H. Wiesenfelder and Dow, Lohnes & Albertson, Washington, D.C.), for appellant.

Stephen J. Sfekas (Tydings & Rosenberg, on the brief for appellee, Community Hosp. & Health Care Systems, Inc., Baltimore).

Jack P. Hartog, Sp. Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen. and Jennifer L. Robbins, Asst. Atty. Gen., on the brief for appellee, MD. Health Resources Planning Com'n, Baltimore).

(Gary R. Alexander, Barbara M. Radcliff and Alexander & Cleaver, P.A., on the brief for appellee, Southern MD. Hosp. Center, Fort Washington).

Argued before WILNER, ADKINS, and ROSALYN B. BELL, JJ.

ADKINS, Judge.

Appellant Doctors' Hospital of Prince George's County (Doctors' Hospital) applied to appellee Maryland Health Resources Planning Commission (Commission) for a certificate of need (CON) to permit an increase in its bed capacity. The Commission denied the application, an action affirmed when Doctors' Hospital appealed to the Circuit Court for Baltimore City.[1] Doctors' Hospital now appeals to us raising, as we see it, four issues:

1. Whether the Commission's decision is supported by substantial evidence;

2. Whether the Commission imposed an illegal moratorium on the issuance of CONs and miscounted bed need;

3. Whether the Commission arbitrarily discriminated against Doctors' Hospital; and

---

1. Additional appellees in this case are Community Hospital and Health Care Systems, Inc., and Southern Maryland Hospital Center. These two Prince George's County hospitals sought to intervene in the circuit court case. While the record is not at all clear that they were permitted to intervene, they participated in the circuit court proceedings and in this appeal. Since everyone has assumed they are in the case, and since their presence or absence makes no difference, because the Commission is unquestionably a viable appellee, we shall do likewise.

4. Whether the Commission engaged in "review by ambush." [2]

We affirm the judgment of the trial court. Before explaining our reasons for doing so, we summarize the regulatory and factual context within which the issues are presented.

## Regulatory and Factual Background

In an attempt to stem the rising tide of health care costs across the country, Congress passed the National Health Planning and Resources Development Act of 1974, now codified at 42 U.S.C. § 300k et seq. (1982). This law provided financial incentives for each state to implement its own health plan and fashion the necessary administrative and regulatory machinery. The Act encouraged states to look at the problems of costly maldistribution and excess supply of certain health services and facilities, including hospital beds. *See* 42 U.S.C. § 300k–2(a)(12), (b)(1) (1982) and 42 C.F.R. § 121.201 (1985).

Maryland's statutory effort at health care regulation can be found in Md. Health-General Code Ann. § 19–101 et seq. (1982 & Cum.Supp.1985). This legislation provides for a systematic, statewide approach to the planning and development of new health care facilities.

As a general rule, a health care facility (including a hospital) that desires to increase its bed capacity must first obtain a CON from the Commission. Health-General Art. § 19–115(h). The Commission must make certain that its decisions on CON applications are consistent with the State health plan as provided for by § 19–114, and with the COMAR regulation outlining the Commission's own review criteria.[3] *See* § 19–118(c)(1). Also relevant to this case is

---

**2.** Because of our decision we need not address an additional issue: whether this court has the authority to direct the Commission to issue a CON.

**3.** The version of this COMAR regulation, 10.24.01. et seq., applicable to this case was the one adopted in 1980. All subsequent COMAR citations will be to this version.

the Southern Maryland Health Systems Plan,[4] which the Commission was obligated to consider. COMAR 10.24.01.-06B(2)(a).

The Commission found that Doctors' Hospital's CON application was consistent with all pertinent standards in the State health plan that were not included in the Southern Maryland Health Systems Plan. Thus the field of conflict is narrowed to two documents: the health systems plan and the COMAR list of criteria.

At the times pertinent to this case, the applicable Southern Maryland Health Systems Plan identified "a bed need projection for Prince George's County of 37 additional medical/surgical beds for 1987." It also provided that "additional beds should be certified in Prince George's County only after ... the above analysis has been completed." The "analysis" referred to was a study to determine "where any additional beds [in Prince George's County] could be located." The study had not been completed when the Commission denied the instant application, although it had been finished by the time this case reached the circuit court. In addition to the 37-bed projection for the Southern Maryland service area, referred to as the availability standard, the Southern Maryland Health Systems Plan contained other area-wide standards with which a CON applicant had to prove itself compatible. Two pertained to the accessibility of medical/surgical units to the majority of the area's population (the accessibility standard) and the overall occupancy rate of units in the area (the cost standard). The Commission found that appellant had failed to meet the availability standard and that the CON project was not necessary for the Southern Maryland area to satisfy the accessibility and cost standards.

---

**4.** Health systems plans are plans developed by local planning agencies. Containing local criteria for service characteristics, they are used as components of the State health plan. *See* § 19–114(a). The health systems plan applicable to this case was the one promulgated by the Southern Maryland Health Systems Agency in September 1982.

The second set of regulations pertinent to this case is that which the Commission promulgated in accordance with § 19–115(c) and which is found at COMAR 10.24.01.06B(2). Listed are some 13 criteria that must be considered before a CON is granted. The Commission found that appellant's application was inconsistent with seven. These concerned the relationship of the project to the applicable health systems plan; the need for the proposed health service of the population to be served, including the elderly (need criterion); the availability of less costly or more effective alternative methods of providing the proposed health services; the immediate and long-term financial feasibility of the proposal (feasibility criterion); the proposal's relationship to the existing health care system; the relationship to ancillary or support services; and the proposal's contribution in meeting the health needs of the medically underserved.[5]

---

**5.** The pertinent COMAR criteria are:
10.24.01.06B(2)
(a) The relationship of the project being reviewed to the applicable health systems plan and annual implementation plan adopted by the HSA [Health Services Agency].

\* \* \* \* \* \*

(c) The need for the proposed health services of the population served or to be served, including an analysis of present and future utilization and demographic patterns, and the extent to which low income persons, racial and ethnic minorities, women, handicapped persons, and other underserved groups are likely to have access to those services. In the case of a reduction or elimination of a service including the relocation of a facility or a service, the need that the population presently served has for the service, the extent to which that need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the reduction, elimination, or relocation of the service on the ability of low income persons, racial and ethnic minorities, women, handicapped persons, and other underserved groups to obtain needed health care shall be reviewed.
(d) The availability of less costly or more effective alternative methods of providing these services.
(e) The immediate and long-term financial feasibility of the proposal, and the probable impact of the proposal on the costs of and charges for the provision of services by the applicant and other institutional providers in the area.
(f) The relationship of the services proposed to the existing health care system of the area.

Appellant's failures to meet the health systems plan standards and the COMAR criteria collectively brought into dispute the four issues before us and a host of subsidiary questions that will be discussed in their proper places.

The procedural history of this case can be sketched as follows:

On September 30, 1982, the Commission received Doctors' Hospital's application for a CON for 100 additional beds. The application was formally docketed on December 6, 1982.[6] At various subsequent times the number of beds requested was reduced to 63, then to 53, and then (it seems) to 37; that, at least, is how the Commission viewed the matter.

It appears that the Commission wished to "batch" Doctors' Hospital's application with one or more other requests for additional hospital beds in Prince George's County, so it could review all of the applications together. *See* § 19–118(e). For whatever reasons, that procedure was not acceptable to Doctors' Hospital. The Commission had not acted on the application within the period prescribed by law[7] and the Hospital sought relief in the Circuit Court for

---

\* \* \* \* \* \*

(h) The relationship, including the organizational relationship, of the proposed health services to ancillary or support services.

\* \* \* \* \* \*

(m) The contribution of the project in meeting the health related needs of members of medically underserved groups which have traditionally experienced difficulties in obtaining equal access to health services (such as low income persons, racial and ethnic minorities, women, and handicapped persons), and particularly those needs identified in the applicable health systems plan and implementation plan as deserving priority.

6. "Docketing" occurs after the Commission staff has conducted a "completeness" review to verify that all blanks on the application form have been filled in and to assure that the application contains "reasonably complete responses" to the relevant review standards and criteria. COMAR 10.24.01.06A (1980).

7. The present time limitations for Commission action are found in § 19–118(g) and (h).

Baltimore City.[8] On July 14, 1983, that court ordered the Commission "to act without delay" on the application.

Pursuant to this judicial mandate, the Commission staff on August 5, 1983, filed a report in the form of "Proposed Findings of Fact, Conclusions of Law and Order." Consistent with all information the Commission had received from outside sources, and with the staff's view of the State health plan and the relevant criteria, the report recommended denial of a CON. Doctors' Hospital submitted a lengthy response to these recommendations, and addressed the Commission briefly at a public meeting, although it did not request the full evidentiary hearing authorized by § 19–118(f). Its efforts were to no avail; on September 27, 1983, the Commission adopted findings of fact and conclusions of law to the effect that Doctors' Hospital had failed to meet the requirements in seven different areas. It passed an order rejecting the application.[9] As we have seen, the Circuit Court for Baltimore City (Hammerman, J.) affirmed this decision.

*Scope of Review*

Our power to review the decision of the Commission, a State executive branch agency, emanates from the Administrative Procedure Act, which in pertinent part provides:

In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the decision of the agency; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

---

**8.** For the present provision authorizing such relief, *see* § 19–118(i).

**9.** The Commission later granted Southern Maryland Hospital Center a CON for 37 additional beds. The propriety of that action is before this court in a separate case. *Fort Washington Community Hospital, Inc., et al. v. Southern Maryland Hospital Center, et al.,* No. 394, Sept. Term, 1985 (argued November 15, 1985).

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Code, State Govt. Article, § 10–215(g) (1984).

■ The assignments of error in these cases concern both factual findings and legal determinations of the Commission. Our scope of review shifts accordingly. When deciding whether any factual finding is in violation of § 10–215(g), Maryland courts have used the substantial evidence test. *See Prince George's Hospital v. Health Services Cost Review Commission,* 302 Md. 193, 486 A.2d 744 (1985) and *Secretary of Health and Mental Hygiene v. Crowder,* 43 Md.App. 276, 405 A.2d 279, *cert. denied,* 286 Md. 745 (1979). Under this test, our judicial review is narrow in scope and the decision of the administrative agency carries a presumption of validity. We must examine all inferences and factual conclusions drawn by the agency to make sure that they reasonably follow from facts. We must also examine all facts found by an agency to insure that there was evidence to support them. We may not, however, reweigh the evidence or reject any reasonable or supportable inference, fact or factual conclusion merely because conflicting or questionable evidence exists. *See Crowder,* 43 Md.App. at 280–82, 405 A.2d 279. This, then, is the scope of review to be used for Issue 1.

■ Much broader, however, is the scope of review to be used for Issues 2, 3, and 4. No factual findings made by the Commission are disputed here; rather the legal principles that it espoused come under challenge. Conclusions of law made by an agency are not presumptively favored, as illegal acts are not based on substantial evidence and must

be corrected. *See Snowden v. Baltimore,* 224 Md. 443, 168 A.2d 390 (1961). The appropriate standard of review is "substitution of judgment." *See Comptroller of the Treasury v. Shell Oil Co.,* 65 Md.App. 252, 500 A.2d 315, 318 (1985) and cases cited therein (review of Tax Court decision). If we have a view as to the applicable legal principle that is different from that of the Commission and the trial judge, we are duty-bound to make the substitution.

## The Issues

### 1. *Substantial Evidence*

We are cognizant of these well-established principles concerning scope of review and with them in mind proceed to examine the hospital's "substantiality" arguments.

### a. The "Accessibility" and "Cost" Standards of the Health Systems Plan

■ On two of them we need not pause long. The Commission concedes that the hospital met the "accessibility" and the "cost" standards.[10] This concession, however, does not mandate reversal. As the hospital has admitted, its burden was to demonstrate compliance with *all* the standards and criteria. If, therefore, there is substantial evidence to support *any one* of the Commission's findings, we must affirm. *Cf. Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 390 A.2d 1119 (1978) (where inconsistent inferences from same evidence can be drawn, it is for agency to draw the inferences). As we shall see, the Commission's order readily passes this test.

### b. The Need Criterion: COMAR 10.24.01.06(B)(2)(c)

The need criterion states that the Commission should consider "[t]he need for the proposed health services of the population served or to be served, including an analysis of present and future utilization and demographic patterns...." This is what the Commission considered. Doc-

---

10. *See* p. 662–663, *supra.*

tors' Hospital objects that the Commission paid too much attention to present utilization factors. It argues that the Commission's role merely is to lay the groundwork for determining future need—in this case 37 beds—and then drop out of the analysis once that number is fixed. This reading, however, is not supported by the plain words of the regulation; nothing in COMAR directs how much or how little weight the Commission must give to present utilization. Further, under the hospital's interpretation, the words "present ... utilization" become surplusage because such an analysis perforce would be incorporated in an analysis of future utilization.

Moreover, the Commission is responsible for promoting an entire health care system in which the efficiency and appropriateness of existing facilities must be considered. *See* Code, Health-General Art. § 19–102 and COMAR 10.24.-01.06F(1)(a)(i). Among the conclusions in the health systems plan applicable to Doctors' Hospital's CON application was that "[B]eds should not be located in areas with under-utilized or unused hospital capacity."

Thus, the Commission exercised proper discretion in weighing present utilization factors, including Doctors' high length of stay rate and the present unused capacity in other facilities in the Southern Maryland area. It found that four of them in 1982 operated at below the 85% medical/surgical occupancy rate set as the minimal standard by the health systems plan. These facts and others made the proposed expansion unjustified in the mind of the Commission. A more attractive alternative, it stated, would be to increase the utilization of the other facilities.

The Commission also sifted through other data, including some concerning the service needs of Prince George's County residents over 65. If we understand appellant correctly, it argues that the mere fact that it is located in an area with a high elderly population is sufficient to satisfy this component of the need criterion. But as the Commission pointed out in its decision, Doctors' Hospital serves a much smaller

percentage of patient days generated by elderly residents than do surrounding facilities, and the proposed additional beds are not geared specifically to the needs of the elderly. Moreover, there was evidence before the Commission showing that Prince George's General Hospital could better serve the elderly.

■ In sum, the Commission properly weighed both present and future utilization factors in its need analysis. Substantial evidence supported its conclusion that the need criterion was not satisfied.

c. The Less Costly Alternatives and Relationship to Existing Health Care Systems Criteria: COMAR 10.24.01.06B(2)(d) and (f)

Appellant's arguments regarding these two criteria are merely reprises of the debate concerning need. Doctors' Hospital avers that because the health systems plan declares a 37-bed need in Prince George's County, Doctors' automatically meets these two criteria. This analysis obscures the fact that COMAR 10.24.01.06B(2)(d) and (f) are criteria independent of the need criterion.

■ The interpretation placed on (d) and (f) by Doctors' Hospital would render them superfluous. Another jurisdiction has held that a showing of need for a number of beds is insufficient in itself for issuance of a CON; a showing that the proposal is consonant with the State health plan is also necessary. *Princeton Community Hospital v. State Health Planning,* 328 S.E.2d 164 (W.Va.1985); *cf. Irvington General Hospital v. Department of Health,* 149 N.J. Super. 461, 374 A.2d 49 (1977) (CON request for additional beds cannot properly be rejected solely on the basis of bed need statistics).

■ The Commission's finding that increasing utilization at existing facilities would be a less costly alternative was based on a staff report and comments at a public meeting. The Commission learned that two neighbors of Doctors' Hospital, the 152-bed Greater Laurel Beltsville Hospital and

the 340-bed Prince George's General Hospital had the low occupancy rates of 60% and 78% respectively. The daily room rates of both these facilities, the Commission found, were about $50 below that of Doctors' Hospital. In addition, the Commission noted that Doctors' Hospital failed to provide data to demonstrate its future relationship to the health care delivery system. There is substantial evidence to support the Commission's finding that the criterion was not satisfied.

### d. The Financial Feasibility Criterion: COMAR 10.24.01.06B(2)(e)

We will elsewhere dispose of Doctors' Hospital's argument that the Commission's review of this criterion was flawed by "review by ambush" and that it engaged in disparate treatment of appellant in this regard. The only remaining contention appellant raises in this category is that there was no substantial evidence to support the Commission's rejection of appellant's vague offer to provide investor funding if necessary because appellant's statement in that regard was "uncontradicted."

Doctors' Hospital argues that the Commission was required by law to believe the unrebutted statement by Doctors' Hospital that if necessary, individual investors would raise the cash necessary to finance the project. Doctors' Hospital cites *Blackmer v. Commissioner of Internal Revenue*, 70 F.2d 255 (2d Cir.1934) to support its assertion, but *Blackmer* states that unchallenged testimony may not be arbitrarily disregarded so far as it is *factual.* A fact is a "thing done; an action performed or an incident transpiring; an event or circumstance, an actual occurrence." *Bonner v. State*, 43 Md.App. 518, 524, 406 A.2d 646 (1979) (quoting Black's Law Dictionary, 531 (5th ed. 1979)). The statement that investors will contribute to the project, of course, is a projection. Projections are not factual. Doctors' Hospital's projection is not rebutted, but statements foretelling the future can rarely be rebutted conclusively.

■ A better rule for our purposes as to the probative value of this unchallenged testimony is found in 5 K. Davis, *Administrative Law Treatise*, § 29:26 at 456 (2d ed.1984). Surveying the current law, Davis concludes: "Uncontradicted evidence may be rejected for adequate reasons that are sufficiently explained." The Commission pointed out that Doctors' assertion was unsupported by descriptions of the availability or the costs of funds provided through the hypothetical investors. Judge Hammerman also noted that the identity of the investors and the sources of their funds were left open to question. We believe that in this situation the bald projection stated by Doctors' Hospital could reasonably be seen as lacking credibility. It need not be deemed conclusive.

Moreover, the Commission staff reviewed Doctors' Hospital's financial statements and operating projections. That review produced evidence sufficient to support the conclusion that the proposed equity funding by savings accrued through increases in patient rates would result in unreasonably high costs to the entire health care system.

e. The Ancillary Services Criterion:
COMAR 10.24.01.06B(2)(h)

■ Code, State Government Article 10–208(h) states that an agency "may use its experience, technical competence, and specialized knowledge in the evaluation of evidence." On this issue, the agency used those skills to find that Doctors' Hospital's application was deficient in describing both its proposed volume changes in ancillary services and the effect its project would have upon community ancillary services. A review of Doctors' application and its response to the Commission's staff report shows that the Commission's decision on this issue was a reasonable one. Doctors' Hospital's discussion of these topics consists of hardly more than a few conclusory statements. For example, Doctors' Hospital declared that although its requested 53-bed addition would require more space and more personnel, the space allotment for ancillary services would not increase "because we are dealing in volume changes rather than in

changes which require additional space such as new equip-ment or new services." But exactly how these increases would be absorbed without increasing storage space was not explained. Additionally, nowhere did Doctors' discuss the impact upon support services in the surrounding com-munity. The cursory treatment Doctors' Hospital gave this criterion is substantial evidence that supports the Commis-sion.

### f. The Medically Underserved Criterion: COMAR 10.24.01.06B(2)(m)

This criterion addresses the question of how well the proposed project will meet the health related needs of groups who historically have been medically underserved, including poor people, minority groups and the handicapped.

Doctors' Hospital's argument that it never has refused admission on account of inability to pay may be a necessary factor in satisfying this requirement, but we think the Commission was correct in finding that this alone was insufficient. The State health plan and COMAR 10.24.01.-06B(2)(m) strongly imply that health care facilities are ex-pected by the State to assume substantial responsibility for their communities. An affirmative duty to act is involved here. This means that the Commission was obliged to inquire not only about the number of medically underserved being refused treatment at Doctors' Hospital but also about how many of them were being treated there. The question, then, before the Commission was this: What effort was Doctors' Hospital making in meeting the needs of the underserved in its community, and would that effort be strengthened by its proposed project? Medicaid, charity and bad debt statistics are valuable data for answering this question, especially when they are compared with those from comparable facilities. In such a comparison, Doctors' Hospital fares poorly.

For example, even though during the time pertinent to this case, Southern Maryland Hospital Center treated only those Medicaid patients that it deemed could not safely be

transported to other hospitals (a policy criticized by the Commission during Southern Maryland's own CON review), its Medicaid patient revenue percentage was more than twice as much as that for Doctors' Hospital. Additionally, Southern Maryland's bad debt allowance was 4.3% and 3.8% of total patient services revenues in 1981 and 1982 respectively, while the figures for Doctors' Hospital were 2.2% and 2.9%. Moreover, the Commission heard a Bowie Health Center board member testify that nearly twice as many indigent, charity, and bad debt patients were served at Prince George's General Hospital and Medical Center than at Doctors' Hospital. A reasonable inference from these facts would be that while Doctors' Hospital does not refuse admission to any indigent patient, it does not have to do so—physicians achieve the desired result by steering indigents away from Doctors' Hospital in the first place and directing them to other facilities.

 Deliberating on this information, the Commission concluded that Doctors' Hospital has been laggard in doing its share to meet the needs of the medically underserved and that its proposed project would do nothing to change this behavior. This conclusion was supported by substantial evidence.

### 2. *Illegal Moratorium*

Having dealt with the objections of Doctors' Hospital collected under the evidentiary issue, we now turn our attention to the issues dealing with the Commission's conclusions of law, keeping in mind that we proceed under the substitution of judgment standard of review.

#### a. The Availability Standard of the Health Systems Plan

As we have noted, one component of the State health plan considered by the Commission was the Southern Maryland Health Systems Plan. It was a provision of that plan that identified a need for 37 additional beds in Prince George's County by 1987. As we have also observed, the State

health plan (incorporating the local health systems plan) contemplated that no additional beds be authorized in Prince George's County until the completion of a study (the subarea study) pertaining to the appropriate location of the additional beds. Location is an important factor. As the Commission pointed out:

> The [health systems plan] standard concerning availability of inpatient medical/surgical services states that inpatient medical/surgical services should be available in sufficient *but not excessive* quantities based on projected medical/surgical utilization and minimum occupancy rates [emphasis supplied].

The underlying concept here is that excessive, unused beds tend to drive up hospital costs. For that reason, additional beds should be approved only when there is a projected need for them and when they are placed in locations at which they will receive maximum use. To authorize additional beds, even though there is a projected need for them, would be counterproductive if the new beds would be placed in a location already well-served with available beds. Because of this location problem, the plan, although it foresaw the need for 37 additional beds, prohibited their authorization until the location study had been finished. Relying on this portion of the plan, the Commission found "that additional beds should not be certified until this analysis is completed...." For that reason it further found that the availability standard (quoted above) had not been met.

It is this that Doctors' Hospital says constituted an illegal moratorium that violated Article 9 of the Maryland Declaration of Rights. That Article provides:

> That no power of suspending Laws or the execution of Laws, unless by, or derived from the Legislature, ought to be exercised, or allowed.

We perceive no illegal moratorium in this case.

The Commission suspended no law; it suspended the execution of no law. It did not decline to consider

Doctors' Hospital's application; it gave it a reasoned and thorough review, albeit after some judicial prodding. It simply decided that it lacked some information—that dealing with bed location—necessary to the making of a favorable decision. The burden, of course, was on Doctors' Hospital to produce evidence sufficient to support the application. That it insisted on a Commission decision before critical information was available did not change the fact that it failed to supply the missing data. The Commission was entitled to consider that lack of data—a lack that was supplied shortly after its decision—in acting on the application. To await the receipt of necessary information is not to suspend a law or to impose an illegal moratorium, especially when the *onus* for supporting an application is on the applicant.

Doctors' Hospital argues that Ch. 102, Laws of Maryland 1985, demonstrates that legislation is required to justify this basis for the Commission's rejection of the application. That Act, emergency legislation approved by the Governor on April 9, 1985, prohibited the Commission from receiving or acting on any CON application (subject to certain exceptions) until October 1, 1985. Among the legislature's concerns were excess hospital capacity (*i.e.*, too many beds) and the need to develop "an institution specific capacity plan in order to rationally address the reduction in hospital utilization and the resultant increase in excess capacity" (*i.e.*, the need to obtain better information about, *inter alia*, the appropriate allocation of beds).

Chapter 102 does not support Doctors' Hospital's contention. What it manifests is substantial legislative concern about the very matter that concerned the Commission—undesirable growth in bed capacity fostered by lack of hard information as to, *inter alia*, geographic (or institution specific) need for additional capacity. That the legislature took the rather drastic step of generally prohibiting the handling of CON applications during a specific period does not mean that the Commission could not, for similar rea-

sons, decline to approve applications until the receipt of information from a pending study.[11]

Our own research has unearthed one case in which a "moratorium" imposed by an agency like the Commission was held to be arbitrary and capricious. In *United Hospital Center, Inc. v. Richardson*, 328 S.E.2d 195 (W.Va.1985), the West Virginia Health Cost Review Agency received United's application for a CON for a Mobile Magnetic Resonance Imaging Unit (MRI). The Agency then decided it would not conduct a preliminary completeness review of the application because the State health plan was silent as to MRI's and because it needed time to develop standards concerning them. The effect of this action was to prevent any further processing of United's application, since under West Virginia law, as under Maryland law, completeness review is a prerequisite to docketing and full review of an application.

The Supreme Court of West Virginia held that the Agency was not authorized to abandon the statutory requirement that completeness of a CON application be determined within 15 days of its receipt. What is more significant, it held that the "moratorium" was unnecessary because, on the record before the court, the Agency could have taken measures to obtain the information it needed after the completeness review and within the time allowed for consideration of the application on its merits. As a consequence, the "moratorium" was arbitrary and capricious. The Agency was ordered to proceed with the processing of United's application.

*United Hospital Center* differs from the case before us in a number of respects. First, the Commission did not suspend all processing of the instant application; it accom-

---

**11.** Doctors' Hospital complains that the study had been "pending" for some six years when its application was denied. It supplies no facts, however, to support a claim of deliberate "foot-dragging" as to completion of the study, or to demonstrate how or why more rapid completion should have been required.

plished the preliminary completeness determination and it considered the application on its merits. Second, the record before us does not show that the Commission could have obtained the bed availability it needed during the review period. Third, the Commission denied Doctors' Hospital's application for a number of reasons, only one of which was the alleged "moratorium." Since, as we have held, those reasons were a sufficient basis for the denial, even if the "moratorium" was arbitrary (and we do not think it was) the result would be unchanged. Although in *United Hospital Center* the arbitrariness could be remedied by a direction to process the application, that could not be done here. In short, *United Hospital Center* is not apposite, and for that reason, as well as the others we have explained, we hold that Doctors' Hospital's "illegal moratorium" contention is without merit.

### b. "Paper Beds"

Another error of law that Doctors' Hospital alleges was committed by the Commission concerned the method it adopted in arriving at the additional bed need projected for Prince George's County by 1987, the planning horizon in use at the time of its application. First, "paper beds," that is, beds that merely had been certified but not yet put into service, were added to beds in actual use. This sum was then subtracted from the total number of beds projected to be needed. This resulted in an additional bed need figure of 37.

Doctors' Hospital says this calculation was arbitrary and capricious. It argues it was unrealistic for the Commission to have counted 164 paper beds for which Bowie Health Center had acquired certification in 1974, along with beds in actual use, because of the small chance that they would ever be built. If we accept Doctors' Hospital's contention, then the additional bed need would jump to 201, and the Hospital would have a strong argument that its entire 53-bed CON request (or even the original 100-bed request) should be granted.

■ The analysis of Doctors' Hospital overlooks the fact that paper beds were included in the bed inventory of the Southern Maryland Health Systems Plan. Indeed, the Commission adopted its analysis from the plan, which identified an additional need of 37 beds. The health systems plan is a factor that must be considered in a CON review, *see* COMAR 10.24.01.06B(2)(a). Appellee, Community Hospital & Health Care Systems, Inc., also argues that the paper beds were specifically taken into account in the inventory of the State health plan, a charge Doctors' Hospital does not deny. Code, Health-General § 19–118(c)(1) mandates that except in emergencies all CON decisions be consistent with the State health plan. The Commission's analysis, then, was not in error. In fact, if the Commission had acted in the way Doctors' Hospital urges, one of two undesirable consequences could have resulted. On the one hand, such an action might arbitrarily have rendered Bowie's CON a nullity without affording Bowie a decertification hearing or any other form of due process. On the other hand, the act would have left the status of Bowie's CON unaffected, thus opening the door to area-wide overbedding if Bowie ever proceeded with its project.[12]

### 3. *Discrimination*

In *Aspen Hill Venture v. Montgomery County Council,* 265 Md. 303, 317, 289 A.2d 303 (1972), the Court of Appeals reversed a denial of rezoning because it was "patently arbitrary and discriminatory" for the District Council to deny Aspen Hill's request for commercial rezoning when it had granted another applicant's such request "on basically the same evidence...." *See also Whittle v. Board of Zoning Appeals,* 211 Md. 36, 45, 125 A.2d 41 (1956) ("[I]t would be arbitrary for the board to arrive at opposite

---

12. The fact that following the Commission's decision in this case the Commission decertified Bowie for this project does not affect this analysis.

conclusions on substantially the same state of facts and the same law").

Interwoven throughout Doctors' Hospital's brief are various charges that the Commission arbitrarily discriminated against it and thus violated the strictures of these cases. Many of these complaints seem to be generated by general unhappiness, because on February 14, 1984, less than five months after rejecting Doctors' Hospital's application, the Commission granted Southern Maryland Hospital Center a conditional CON for 37 additional beds.

At the outset, we observe that this action in and of itself falls far short of what *Aspen Hill* proscribes. *Aspen Hill* involved two properties, similarly situated, located within 1,500 feet of each other. It was under these circumstances that the Court of Appeals found arbitrary and discriminatory action when rezoning for one property was granted while it was denied for the other. The two requests, the Court noted, had been presented "on basically the same evidence...." 265 Md. at 317, 289 A.2d 303. Here we have, it is true, two for-profit hospitals, both located in Prince George's County. But they are located miles apart, and we glean from the record that there are differences as to their proximity to other health facilities and as to other pertinent factors. We also note that in Southern Maryland's case, the long-awaited study (sometimes referred to as the sub-area study—*see* discussion, pp. 674–675, *supra*) was available; it was not at hand while Doctors' Hospital's application was under Commission review. But the fundamental problem with Doctors' Hospital's contention is that we can make no determination that the evidence in this case was "basically the same" as the evidence in that case. Southern Maryland went before the Commission with a full evidentiary hearing—a procedure that Doctors' Hospital eschewed. What evidence that hearing revealed we do not know, and thus we can make no general evidentiary comparisons between that case and this.

Turning to the specifics of Doctors' Hospital's discrimination arguments, we are told, first, that it and Southern Maryland were treated disparately under the "accessibility" and "cost" standards applied by the Commission. In Doctors' Hospital's case the Commission found that both standards were met "without the addition of the [Doctors' Hospital] project." It denied the application. In Southern Maryland's case it found that the cost standard was met "without the addition of the [Southern Maryland] project." It granted a conditional CON. Assuming, *arguendo*, that this shows disparate treatment, it is an issue we need not address. On appeal, the Commission concedes that Doctors' Hospital met the "accessibility" and "cost" standards. Because, as we have shown, there are other bases for upholding the Commission's decision in this case, its error in application of these standards is not a basis for reversal on the basis of disparity.

As to the "need" criterion, Doctors' Hospital claims disparity because as it reads the record one reason for rejection of its application was the lack of *present* need for 37 additional beds, whereas in Southern Maryland's case, a basis for granting the CON was a *present* need for 37 additional beds. Doctors' Hospital misreads the Southern Maryland decision. The mention there of bed need was clearly tied to the 1987 forecast of the health systems plan. Moreover, in the Southern Maryland case, the Commission was focusing substantially on bed need in a particular area of Prince George's County—an area far removed from Doctors' Hospital—and on the problem of unused capacity as affected by geographical location and the proximity of other health care facilities. No arbitrary discrimination appears here, and for essentially the same reasons, we reject the claim that there was disparate treatment under the "less costly alternatives" criterion.

Doctors' Hospital also claims that one reason for rejecting its application was its failure to address "volume changes in ancillary services." According to the Commis-

sion's Southern Maryland decision, that hospital did not address this standard either, but instead of denying the CON, the Commission granted it subject to a condition that Southern Maryland supply additional information showing it met the criterion. Once again, we do not have the full Southern Maryland record. We cannot tell to what extent this subject may have been covered at the evidentiary hearing, or how the reduction of Southern Maryland's original request for 120 beds to a conditional CON for 37 beds may have affected the matter. But it does not seem unreasonable that an application found acceptable in many respects (unlike Doctors' Hospital's) should be granted subject to a condition that it supply additional information in one respect. We see no improper discrimination here.[13]

Another charge of discrimination arises in connection with the "financial feasibility" criterion. Doctors' Hospital's offer to fund its project through equity financing was rejected; an opposite result was reached in Southern Maryland's case. We shall have more to say about this criterion when we consider the "review by ambush" contention and have already touched on it in our substantial evidence review. For present purposes, without access to the full record in the Southern Maryland case, we cannot say that the different results were arbitrarily discriminatory because, absent that information, we cannot say that they were based on "basically the same evidence." This is also true as to Doctors' Hospital's assertion that improper disparity exists in the treatment of this criterion as between it and yet another hospital, Suburban Hospital Association. Whether equity funding is financially feasible depends on

---

**13.** Our discussion of the Southern Maryland Hospital Center CON and the decision relating to it is based on the record in the case *sub judice.* We have before us neither the full record nor the issues raised in the appeal from the Southern Maryland decision. That case is *Fort Washington Community Hospital Center v. Southern Maryland Hospital Center,* No. 394, Sept. Term, 1985; *see* note 9, *supra.* Nothing said here is intended to address or decide the issues in that case.

the evidence before the tribunal making that decision in each case.

 Doctors' Hospital raises another and more general allegation of discrimination. It is that the Commission discriminates against for-profit hospitals because it thinks "that the way proprietary hospitals are reimbursed for their investments in hospital projects is unreasonable." There is nothing in the record to support this indictment, unless it be a table showing the outcome of CON applications from 1973 through 1983. Doctors' Hospital says this table shows that with the exception of the Southern Maryland application we have discussed, "every single application by a for-profit hospital had been disapproved" while "every application for more beds by a non-profit hospital was approved." Even assuming that this characterization of the information portrayed in the table is correct, this table is not helpful to Doctors' Hospital. We are given a sparse listing of outcomes; we know nothing about factors that may have affected those outcomes and rendered each of them perfectly appropriate. Once again, we cannot conclude arbitrary discrimination because we cannot say that all these cases were decided on "basically the same evidence."

In summary, we reject Doctors' Hospital's discrimination contentions.

### 4. "Review by Ambush"

Although Doctors' Hospital has charged "review by ambush" in several contexts, its principal argument under that heading is directed to application of the "financial feasibility" criterion. Why the contention is without merit in that context demonstrates its general unpersuasiveness.

In its CON application, the hospital proposed various ways of funding the construction and equipment acquisitions required in connection with the additional beds. The estimated capital outlay was over three million dollars. It said that, if necessary, its present investors would contribute to the project. The Commission found that "adequate equity funds for this project are not available if only limited

to future operational savings" and that "the Hospital's liquid assets, alone, or in combination with operating surpluses, are not adequate to support a project of this scope." It further found that with respect to "the applicant's statement that, if necessary, the Hospital's present investors will contribute to the project ... neither the availability nor the costs of funds provided through such investors has been described." The Commission concluded that "the criterion at COMAR 10.24.01.06B(2)(e) is not met."

Doctors' Hospital says that in the administrative review process "[t]he right to a hearing means the right to a meaningful hearing with the awareness of what must be countered," 2 Am.Jur.2d *Administrative Law* § 417 (1962) and that a hearing should not be "conducted on the level of a game of blindman's bluff," *Simmons v. United States,* 348 U.S. 397, 405, 75 S.Ct. 397, 99 L.Ed. 453 (1955). This is all very well, but the principles cited by the hospital have no bearing on the case before us.

██ Put aside the fact that the hospital itself declined to request a hearing at which it might have enlarged on its position as to contributions from investors. Put aside the fact that by virtue of the COMAR regulations the hospital was aware of what it had the burden of showing in order to obtain a CON. What remains is the fact that the initial staff recommendations to the Commission raised the very problem now under consideration. Doctors' Hospital, as we have seen, responded at length to that document. But it supplied no additional information on the subject of investors' contributions. There is no review by ambush here. The hospital was told that information it had supplied was in insufficient detail; it elected not to supply additional information. We reject this contention.

### Conclusion

Because we conclude that significant portions of the Commission's decision were supported by substantial evidence, and because we disagree with appellant's assertions

as to the existence of errors of law, we affirm the judgment below.

JUDGMENT AFFIRMED. APPELLANT TO PAY THE COSTS.