■ In the Matter of MURIEL STURMAN, Doing Business as DUMONT NURSING HOME, Appellant, v HOLLIS S. INGRAHAM, as Commissioner of Health of the State of New York, Respondent.—In a proceeding pursuant to CPLR article 78, *inter alia,* to review respondent's determination, dated October 25, 1974, which, after a hearing, denied petitioner's application to construct and operate (as a physical addition to the Dumont Nursing Home) a 90-bed health related facility, petitioner appeals from a judgment of the Supreme Court, Westchester County, entered July 2, 1975, which dismissed the petition. Judgment reversed, with costs, determination annulled, and matter remitted to the respondent for a rehearing and a new determination, in accordance herewith. The question presented is whether the State Health Commissioner's denial of petitioner's application was based upon a review of the facts of this particular case or was based solely, or principally, upon his

having applied to petitioner's pending application a newly announced guideline which was (1) not filed with and published by the Secretary of State (as "rules" or "regulations" are generally required to be under the State Constitution and the Executive Law), (2) not enacted as a rule or regulation by the State Hospital Review and Planning Council, pursuant to subdivision 2 of section 2803 of the Public Health Law, and (3) applied as a fixed, rigid, general policy, predetermining that petitioner's application would be denied no matter what its merits, and precluding consideration of the facts of petitioner's particular case. In our opinion the commissioner's denial of petitioner's application was arbitrary because his review thereof suffered seriously and prejudicially from the first and third of the aforesaid defects of the new guideline. Accordingly, there must be a rehearing and a new determination. We find it unnecessary to reach the question of whether the guideline, to be effective, should have been enacted by the State Hospital Review and Planning Council. Petitioner is the holder of an operating certificate from the State Department of Health authorizing her to operate a 120-bed nursing home in New Rochelle, Westchester County. The facility is known as the Dumont Nursing Home. On or about October 21, 1971 she filed an amended application with the Department of Health for permission to construct and operate a 90-bed health related facility as a physical addition to the Dumont Nursing Home. Section 2802 of the Public Health Law provides, in pertinent part: "The construction of a hospital, whether public or private, incorporated or not incorporated, shall require the prior approval of the commissioner. * * * 2. The commissioner shall not act upon an application for construction of a hospital unless (a) the applicant has obtained all approvals and consents required by law for its incorporation or establishment (including the approval of the public health council pursuant to the provisions of this article) and until the state hospital review and planning council and the regional hospital planning councils concerned have had a reasonable time to submit their recommendations; *and (b) the commissioner is satisfied as to the public need for the construction, at the time and place and under the circumstances proposed,* provided however that, in the case of an application by a hospital established or operated by an organization defined in subdivision one of section four hundred eighty-two-a of the social services law, the needs of the members of the religious denomination concerned, for care or treatment in accordance with their religious or ethical convictions, shall be deemed to be public need." (Emphasis supplied.) Under the definitions set forth in subdivision 1 of section 2801 of the Public Health Law, nursing homes are included in the definition of "hospital". The State Hospital Review and Planning Council is empowered to adopt "rules and regulations, subject to the approval of the commissioner, to effectuate the provisions and purposes" of article 28 of the Public Health Law (Public Health Law, § 2803, subd 2). On or about January 1, 1972, while petitioner's application was pending before the Department of Health, the commissioner announced the "Commissioner's 6 Point Program to Control Long Term Care Cost Increases" (the Program). Point I of the Program is "INSTITUTION OF STRINGENT REVIEW OVER LONG TERM CARE APPLICATIONS LIMITING APPROVAL TO SPECIFIC COUNTIES HAVING SERIOUS UNMET NEED." Part of the announced Program is a map entitled "Long Term Care Need. Satisfaction by County-1975". This map shows each county of the State. As can be seen from the key, the commissioner has fitted each county into one of the following three classifications: "[1] 90% or more of the 1975 need is satisfied. No further approvals are indicated at this time. [2] 75–89% of the 1975 need is satisfied. Additional approvals are possible where carefully

documented local need is demonstrated. [3] < 75% of the 1975 need is satisfied. Additional approvals are indicated." The commissioner placed Westchester County in the first classification, i.–e. "90% or more of the 1975 need is satisfied. No further approvals are indicated at this time." Petitioner's application came before the State Hospital and Review Planning Council. Its memorandum shows that a staff report had found that "there is a public need for 90 health related beds in Area 23" and that the "Department" had recommended approval. The said council, however, on February 3, 1972, recommended: "Disapproval on the basis of need, subject to the concurrence of the Northern Metr. Council." The commissioner advised petitioner of his intent to disapprove the petition. Subdivision 5 of section 2802 of the Public Health Law provides: "If the commissioner proposes to disapprove an application for construction of a hospital, he shall afford the applicant an opportunity to request a public hearing." Petitioner accordingly made such request; a hearing was held on nine separate dates between September 27, 1972 and July 5, 1973. The commissioner's answer in this proceeding (and therefore the record on this appeal) does not contain the transcripts of the hearing or the report and findings of the hearing officer. We learn something of the hearing officer's report from the commissioner's order of October 25, 1974 which denied petitioner's application. The contents of that order confirm that the commissioner had promulgated, and was executing, his percent-of-need guideline and that, although the hearing officer had recommended approval, the commissioner disapproved petitioner's application because he had predetermined that, in Westchester County, "90% or more of the 1975 need is satisfied. No further approvals are indicated at this time." It is manifest that the guideline applied by the commissioner in rejecting petitioner's application had not been filed with the Secretary of State as "rules" or "regulations" are required to be. The commissioner's answer in this proceeding states, by way of an affirmative defense and objection in point of law: "12. The '6 Point Program' is a guideline, not a rule or regulation, and, contrary to the allegations in paragraphs 'SIXTH' and 'SEVENTH' of the petition, need not be adopted by the State Council or filed with the Secretary of State. Petitioner has no standing to seek an order declaring this intra-departmental Guideline to be a regulation, nor does this Court have jurisdiction to issue such a declaration." Section 8 of article IV of the New York State Constitution provides: "No rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations, by appropriate laws." Section 101-a of the Executive Law is entitled "Legislative notification of the proposed adoption, amendment, suspension or repeal of agency rules". It states: "1. Definitions. As used in this section, * * * b. 'Rule' means the whole or part of each agency statement of general applicability or regulation or code that implements or applies law, or prescribes the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof, except such as relates to the organization or internal management of the agency." Section 102 of the Executive Law contains provisions implementing and furthering the above constitutional requirement. In our opinion, insofar as appears from this record, the commissioner denied petitioner's application by applying to it that which the commissioner calls a mere "guideline", but which was in fact a rule or regulation which should have been previously

filed in accordance with the above-cited constitutional and statutory provisions (see *People v Cull,* 10 NY2d 123). In *Cull,* Chief Judge Fuld, writing for a unanimous court, stated (pp 126–129): "The term, 'rule or regulation', has not, it is true, been the subject of precise definition, but there can be little doubt that, as employed in the constitutional provision, it embraces any kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future. The label or name employed is not important and, unquestionably, many so-called 'orders' come within the term. * * * Because of the 'ever-increasing body of administrative law,' with constantly new and changing regulations, it was equally important that a 'common' and 'definite place' be provided where the exact content of such rules and regulations, including any changes, might be found. In other words, a 'central' place was needed 'where * * * anyone may examine in that one place what the law or rule is that has been enacted affecting his particular interest.' * * * We know that underlying the provision was the desire to have all rules and regulations affecting the public filed in one, easily available, central place. We should not strive to read exceptions into the section or construe it so as to permit the official in charge of the bureau, commission or authority to avoid the necessity of filing by attaching the label 'order' or 'statement of policy' or some other term to what is essentially a rule or regulation. The spirit and design of the constitutional provision are best effectuated by requiring the administrator, if he wishes the rules and regulations of his agency or department to be effective, to file them no matter what label is assigned to them." Further, insofar as appears from this record, the petitioner's application was denied not on the basis of the commissioner's review of the facts and merits of her application, but on the basis of applying to the petitioner's application a preset, rigid numerical policy (not contained in the statute) which foredoomed the application. That procedure precluded a fair review and resulted in an arbitrary determination (see *Matter of Swalbach v State Liq. Auth.,* 7 NY2d 518). Thus, in *Swalbach,* the Court of Appeals annulled a determination of the State Liquor Authority and stated (pp 526–527): "In sum, then, the statement of a general 'policy' which excludes liquor stores from every shopping center is unreasonable and unsupportable. This does not mean, though, that the Authority will be powerless ever to disapprove applications for transfer to a location in a shopping center. Of course it has such power, but it must deal with the situation case by case, appraising the facts as each application is submitted. The agency may not avoid the duty imposed upon it, of exercising a sound discretion in each case, by adopting an all-encompassing shopping center 'policy', for, by so doing, it forecloses consideration of the various factors which the Legislature intended that it take into account in reaching a decision. * * * However, despite the fact that the present record does not justify refusal of the petitioner's application, we have decided that it is more in accord with the legislative design to remit the matter to the Authority so that it may reconsider the application on its particular facts without reliance on the invalid general shopping center prohibition." Finally, we note that there are vague suggestions in the record that petitioner's application was submitted to regional councils encompassing an area of which Westchester County is only a part. However, insofar as it appears from this record, the commissioner's guideline can result in arbitrary determinations because approval or disapproval hinges upon which side of a county line an applicant plans his facility. Obviously, the determination should be based upon the needs of an area and the facts of the particular case, and not solely upon rigid or artificial geographical segmentations. Hopkins, Acting P. J., Cohalan, Christ, Shapiro and Titone, JJ., concur.