506 A.2d 1207

**PERINI SERVICES, INC.**

**v.**

**MARYLAND HEALTH RESOURCES PLANNING COMMISSION, et al.**

**No. 932, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

April 7, 1986.

190

Charles Moran (Melanie D. Anson and Semmes, Bowen & Semmes, on brief), Baltimore, for appellant.

James A. Forsyth, Towson, for appellee, Reeders Memorial Home. (Stephen H. Sachs, Atty. Gen., Varda N. Fink and Roberta M. Ward, Asst. Attys. Gen. on brief, for appellee, Maryland Health Resources Planning Com'n), Baltimore, for appellees.

Argued before GILBERT, C.J., and BLOOM, and ROSA-LYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

Appellant Perini Services, Inc. applied to appellee Maryland Health Resources Planning Commission [1] for a certificate of need (CON) to construct a 144 bed comprehensive care nursing home and a twenty person adult day care center in Hagerstown, Washington County. The Commission denied the application and the Circuit Court for Washington County affirmed. Perini appeals that order alleging:

A. "The Decision of the Maryland Health Resources Planning Commission ... was erroneous as a matter of law because it was not consistent with the effective State Health Plan.

B. "The Commission exceeded its statutory authority and abused its discretion by basing its Decision on a proposed regulation which had not yet become effective under Maryland law.

a. "The Commission's characterization of its proposed regulation as 'important and relevant information' in order to incorporate the proposed regulation for decision making purposes was erroneous as a matter of law.

b. "Proposed policy changes which alter the bed need methodology, in contrast to mere statistical updating, must have become effective as rules or regulations before being used for adjudicative purposes by the Commission.

C. "The Commission's failure to interpret and apply its regulatory review criteria in a manner consistent with established Commission precedent in similar cases was an

---

[1]. Reeders Memorial Home, located in Boonsboro, Maryland, is an additional appellee in this case. Perini Services, Reeders Memorial Home and Hagerstown Medical Services all applied for a CON for projects in Washington County triggering a Comparative Review by the Commission. Reeders was granted a CON. Hagerstown chose not to appeal that decision.

arbitrary and capricious action denying Appellant due process and equal protection of the law.

D. "The Commission erred in denying Appellant a Certificate of Need when Appellant was consistent with review criteria, often in a superior way, and when, under the legally binding regulation, there remained significant unmet need for nursing home beds in Washington County.

a. "Because the questions presented are legal rather than factual in nature, this Court should apply the substituted judgment standard.

b. "Because the decisions below are based on errors of law, this Court should reverse the Commission's Decision as to Appellant and grant Appellant a Certificate of Need for its project."

In March 1983, Perini Services, Reeders Memorial Home and Hagerstown Medical Services filed with the Commission letters of intent stating that each desired to construct or expand nursing home projects in Washington County. A staff report was issued. The Commission conducted an evidentiary hearing and rendered a decision, albeit late,[2] on the CON applications.

After hearings on three separate days, the Commission concluded that Perini's proposal was not consistent with the applicable standards and awarded a CON for fifty beds to the Reeders project on the condition that it make 31% of its beds available to Frederick County residents. The State Health Plan (SHP) in force at the time said 233 comprehen-

---

2. Md. Health—Gen'l. Code Ann., § 19–118(f)(1) (1982, 1984 Cum. Supp.) and COMAR 10.24.01.07G(1) and M require the Commission to reach a final decision on applications involved in a Comparative Review by the 150th day after docketing of the applications. When the Commission failed to issue its staff report within the required time period, Perini and the other applicants instituted suit in the Circuit Court for Baltimore City against the Commission seeking an injunction requiring the Commission to perform its administrative duties in a timely manner. The court ordered the Commission to take timely action and render a decision on the CON applications by August 14, 1984.

sive care nursing beds were needed in Washington County while none were needed in Frederick County.

Perini concluded that the Commission ignored the current SHP's bed need projections and instead illegally applied the bed need projections contained in the proposed SHP that had been adopted by the Commission but was not yet an effective regulation.[3] That new plan projected a zero need for beds in Washington County and a 148 bed need for the entire health systems area of Western Maryland. All parties agreed the proposed SHP was not a binding regulation at the time the Commission denied Perini's application.

Asserting the Commission erred as a matter of law in applying the proposed SHP, Perini appealed to the circuit court which affirmed.

## I. REGULATORY CONTEXT

We need not discuss the history behind the Commission and instead invite the reader to this Court's explanation of its regulatory origin in *Doctors' Hospital of Prince George's County v. Maryland Health Resources Planning Commission, et al.*, 65 Md.App. 656, 501 A.2d 1324 (1986). We will, however, set out the regulatory framework as it relates to the instant appeal.

The Commission has final authority to act upon CON applications. Md. Health—Gen'l. Code Ann. § 19–118(d), (1982, 1984 Cum.Supp.). The Code requires that the Commission make certain that its decisions in this regard are consistent with the SHP under § 19–114, *supra* and with the COMAR regulations outlining the Commission's own review criteria.[4]

---

**3.** We will refer to the plan in force at the time of the Commission's decision in this case as the "SHP" or "current plan", while the proposed SHP not yet in force will be referred to as the "new plan" or the "proposed SHP."

**4.** All references to COMAR 10.24.01 *et seq.* are to the Emergency Regulations published on March 18, 1983 which continue to apply to CON applications submitted after March 18, 1983 and before April 23, 1984. COMAR 10.24.01.23B(2).

## Health Plan

Under § 19–114(a), *supra* the Commission is charged with adopting an SHP at least every five years. The SHP is an officially promulgated regulation of the Commission. It represents a broad policy document outlining Maryland's current and future health care system. The SHP must include standards and policies for evaluating CON applications which assess the availability, accessibility, cost and quality of health care. Included in these standards are methodologies developed by state and local planning personnel which quantify the number and types of health care services needed for an area.

The Long Term Care portion of the SHP addresses issues pertinent to the development of nursing homes. This section also incorporates local health systems plans (HSP) which address specific local or regional issues. While the Commission is a State agency, Maryland established five local health systems agencies (HSA)[5] which not only develop their own HSPs, but review CON applications for projects in their HSA locale. Since each HSA faces concerns unique to it, each HSP's formula and standards have been tailored to solve perceived area-specific problems.

This appeal concerns only the HSA for Western Maryland and its HSP (WMHSP). The 1980 WMHSP contains a bed need methodology as well as general policies, criteria and standards for nursing home services in the four counties of Western Maryland: Allegany, Frederick, Garrett, and Washington.

As stated, the SHP applicable to the projects involved in the case *sub judice* was the 1981 Revised SHP. The proposed SHP, which embodied health planning through 1988, was adopted as a final regulation by the Commission on August 14, 1984 and was published in the Maryland

---

5. The five HSAs for Maryland are: HSA of Western Maryland, Montgomery County HSA, Southern Maryland HSA, Central Maryland HSA, and Health Planning Council of the Eastern Shore.

Register on the same date. The proposed SHP became effective approximately three weeks later. This new plan, *inter alia,* revised the blueprint for determining bed need under the SHP. Under this new formula, zero bed need was projected for Washington County and only 148 beds were projected as needed for the entire Western Maryland area with priority given to Frederick County.

Thus, since the proposed SHP was not the governing document, all parties concede that Perini's application had to be evaluated for consistency with both the 1981 SHP and the 1980 WMHSP.

### Regulations

A CON application must also be evaluated for compliance with the review criteria codified in COMAR. § 19–118(c)(1), *supra.* The regulations embody thirteen criteria and standards against which all certificate requests must be reviewed including, *inter alia,* need for the project, contribution to reducing out-migration, and proximity to a patient's support group. COMAR 10.24.01.07D(2)(a)–(m).

## II. COMMISSION DECISION

The Commission's decision denying Perini's CON rested on two grounds: 1) inconsistency with the 1981 SHP and 1980 WMHSP and 2) inconsistency with the COMAR regulatory criteria.

### 1981 State Plan/1980 Local Plan

The Commission found Perini violated five standards identified under the State and local health care plans.

### —Availability—

WMHSP criterion 1, standard 1 provides:

"The number of comprehensive long-term care beds should be based on the long-term care bed need methodology." [6]

---

**6.** The long-term care bed need methodology takes into account population projections and existing nursing home bed inventory statistics.

The discussion in the WMHSP following this standard outlined a historic pattern of maldistribution of nursing home beds in Western Maryland.

The Commission determined Perini's project was not consistent with the intent of the standard. In so doing, the agency concluded that the Hagerstown location of its proposed facility would not further the WMHSP goal of retarding out-migration of Frederick County residents to Washington County for nursing home care.

Further, the Commission stated that under this standard, it "peered over the wall" at the information contained in the proposed SHP. Noting that under the new plan Frederick County was allocated beds on a priority basis, the Commission determined that approval of the Perini project would have preempted the awarding of beds to applicants in Frederick County, thus exacerbating the maldistribution problem identified in the 1980 WMHSP and reaffirmed in the proposed SHP.[7]

The Commission also found Perini violated SHP standard LT 2b mandating that

"[p]roposals involving [nursing home] beds which reduce the need for patients to migrate out of their area of residence shall be preferred over those which do not." Since the Commission defined "area of residence" as the county wherein the patient resides, it concluded that approval of additional beds in Hagerstown would increase the need for Frederick countians to migrate for care. The Commission acknowledged that the Reeders facility was located in Washington County, but recognized that it

---

These variables are periodically updated. The utilization adjustment and migration factors are also calculated into the formula. Any changes in the migration factor must be justified. Md. State Health Plan, 1981 Revision, Vol. 1–2, LT–40.

7. In fact, if Perini had been awarded its requested 144 beds, only four beds would have been available for distribution through 1988 in the entire Western Maryland Health Systems Area under the proposed SHP.

was situated only two miles from the Frederick County border and approval of its project would make additional resources available to rural Southern Washington and Frederick Counties.

### —Accessibility—

The Perini application was also deemed inconsistent with WMHSP criterion 4, standard 1, "Access to long-term care facilities for all residents." Standard 1 provides:

"Reasonable access will be considered to be within 60 minutes normal driving time from the patient's regular physician and relatives."

The agency viewed this standard from the perspective of the Frederick County resident out-migrating to Perini's facility in Hagerstown to secure nursing home care, rather than from the point of view of a Washington County citizen. Accordingly, it concluded that Perini's proposal violated the "intent" of the standard.

### —Miscellaneous WMHSP Requirements—

The Commission also concluded Perini was not in compliance with a WMHSP criterion requiring that facilities demonstrate conformance with all safety regulations. It noted that while Perini did not present sufficient evidence to show compliance, this deficiency could be corrected by submission of additional evidence.

Similarly, the agency also found that Perini did not present documentation of transfer and referral agreements with other less and more intensive care facilities as required under the WMHSP. It recognized, however, the difficulty new hospitals face in attempting to comply with this standard and provided that if Perini met all other criteria, it

could conditionally grant a certificate upon provision of this evidence.[8]

### COMAR Regulations

The second basis for denying Perini's CON was its inconsistency with the COMAR regulatory criteria.

#### —10.24.01.07D(2)(c) Need—

Perini's application was found inconsistent with the regulatory criterion relating to need. This regulation requires the agency to assess:

> "[t]he need for the proposed health services of the population served or to be served, including an analysis of present and future utilization and demographic patterns...."

The Commission stated it examined present and future utilization statistics of nursing homes in Western Maryland and demographic data using the 1981 Nursing Home Survey and concluded that there was no need for another nursing home in Hagerstown. It also examined this standard in conjunction with WMHSP criterion 1, standard 1, SHP standard LT 2b and the information contained in the proposed SHP.

#### —10.24.01.07D(2)(d) Less Costly Alternative and (g) Alternative Uses of Resources—

Based on the lack of need under COMAR criteria, the Commission also determined that Perini's application was inconsistent with the above two regulations.

### III. SCOPE OF REVIEW

Before we turn to an examination of the disputed issues, we must determine the appropriate scope of review to be employed. This Court is empowered to review the decision of the Commission under Maryland's Administrative Proce-

---

8. Perini does not appeal the Commission's ruling on these two miscellaneous requirements.

dure Act, codified at Md.State Gov't.Code Ann. § 10–215 *et seq.* (1984).

Although Perini labels the assignments of error as purely legal, the thrust of its contentions are both factual and legal. When determining whether a factual finding is in violation of § 10–215, *supra,* the substantial evidence test is the appropriate standard of review. *Doctors' Hospital of Prince George's County, supra* at 667, 501 A.2d 1324. Under the substantial evidence test, the decision of the administrative agency is presumed valid, and all inferences and factual conclusions made by the agency must be affirmed if there is evidence to support them.

Our scope of review changes, however, when we consider whether the Commission erred as a matter of law. Where Perini does not challenge the factual findings made by the agency, but rather the legal principles or regulatory interpretations utilized by the agency, the substituted judgment standard is to be used. We may substitute our judgment for that of the agency, because "illegal acts are not based on substantial evidence and must be corrected." *Doctors' Hospital of Prince George's County, supra* at 667–68, 501 A.2d 1324. When the issues in an action primarily involve questions of law, this Court must substitute its judgment for that of the agency if our interpretation of the applicable legal principles is different. *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 490 A.2d 1296 (1985).

Perini's first contention is that the Commission erred in finding that the CON application was not consistent with SHP/WMHSP standards and COMAR regulations. This challenge presents this Court with both legal and factual questions. The substituted judgment test is the analysis employed when we interpret the requirements of the SHP/WMHSP and COMAR. The substantial evidence standard is the review we will engage in when determining whether the Commission erred in finding that Perini's appli-

cation was not consistent with those regulations as so interpreted.

Perini's second contention encompasses whether the Commission erred as a matter of law in utilizing policies and information contained in a regulation not yet legally effective. To resolve this issue our scope of review is the substituted judgment test. We need not consider the appropriate standard of review with respect to Perini's third assertion that the Commission's decision was arbitrary and capricious for the reasons set forth, *infra*.

Finally, Perini's fourth challenge is merely a summation of its position and a directive that we order the Commission to grant it a CON. In light of our holding, we need not consider the question of the power of this Court to order the agency to grant a CON.

Having set out the appropriate review standards we will use to examine Perini's challenges, we now turn to the merits of this controversy.[9]

## IV. INCONSISTENCY WITH SHP/WMHSP

Perini suggests to this Court that the Commission's decision granting a CON to Reeders was "justifiable only under the policies and bed need determinations contained in the Proposed SHP (which ... contained policy changes which eliminated Washington County bed need and established a bed need in Frederick County.)" Perini thus concludes that the Commission's decision was inconsistent with the current SHP violating Md. Health-Gen'l. Code Ann. § 19–118(c)(1), *supra*.

This section mandates that

---

**9.** Perini filed with this Court a twenty-five page reply brief with a twenty-six page appendix attached. Much of this material was not in reply to either the Commission's or Reeders's brief, but instead was a regurgitation of its arguments set out in its original brief. Moreover, several arguments or assertions stated in its reply brief should have been set out in the first instance in its original brief. Since Perini's second brief does not meet the spirit of a reply brief, we do not find it necessary to respond to it in its entirety.

"all decisions of the Commission on an application for a certificate of need, except in emergency circumstances ... shall be consistent with the State health plan and the standards for review established by the [Commission]." [10]

As we stated, under the "availability" standard, the SHP/WMHSP bed need methodology projected that 233 long-term care beds were projected for Washington County while none were projected for Frederick County. Perini, in effect, asserts that this bed need figure is the determining calculation in granting a CON, and since the Commission did not grant it a certificate, but instead granted one to Reeders with the condition that it make a percentage of its services available to Frederick County residents, the Commission's decision is in error.

■ Initially, we observe that Perini's argument ignores two important considerations. First, while the CON awarded to Reeders was approved subject to the condition that it "continue to utilize 31% of its total beds to serve Frederick County residents ...," Reeders is located in and serves Washington County residents as well. The Commission clearly did not ignore the Washington County bed need calculation as Perini suggests. In addition, Perini's contention seems to overlook the requirement that not only must the Commission's action be consistent with the governing health plans and regulations, but the application under review itself must be consistent with the health laws as well. COMAR 10.24.01.07D(1). Perini cannot obscure the fact that its application was not consistent with the SHP/WMHSP and COMAR by merely claiming the Commission's decision failed to abide by the statutory mandates.

### Bed Need Figure

The Commission did not ignore the SHP/WMHSP bed need determination as challenged by Perini, but instead

---

**10.** Ch. 112, Acts 1985 substituted "Commission" for "Council"—the predecessor to the Commission.

considered that figure in relation to the policies, recognized in both the 1981 SHP and 1980 WMHSP, discouraging maldistribution of facilities and out-migration. The 1980 WMHSP contains the following statements to this effect:

"As can be seen, a definite trend of out-migration for care has developed due to the fact that a disproportionate number of beds were in the past placed in Washington County. As a result, residents of Frederick and Allegany Counties went to Washington County for care. 1980 WMHSP at V–20, 721.

\*　　\*　　\*　　\*　　\*　　\*

"Theoretically, the ideal situation would exist when every person requiring care could be serviced in his/her county of residence. [I]n a case such as in Western Maryland, where it is projected that additional beds will be needed in the future and where unbalanced migration patterns exist due to mislocation of facilities, it behooves health planners to encourage more optimal migration patterns. *Id.* at V–19, 720.

\*　　\*　　\*　　\*　　\*　　\*

"Improved geographical distribution of facilities would increase access to long-term care services by consumers and would permit patients to maintain relationships and contacts with friends and relatives." *Id.* at V–27, 728.

Using data from the 1981 Nursing Home Survey, the Commission concluded that the above goals would not be met by approval of the Perini facility even though the bed availability figure would allow for approval. The data reviewed by the Commission indicated that:

1. While eleven nursing homes are located in Washington County, only five are located in Allegany County, four in Frederick County and three in Garrett County.

2. Since the approval of one facility in Allegany County and one in Frederick County after the Nursing Home Survey was conducted, forty-four percent of all approved nursing homes in the WMHSA are located in Washington

County, while only thirty-five percent of the population aged 65 and older resides in that county.

3.   As of July, 1984, seven of the eleven Washington County facilities were located in Hagerstown.

4.   Sixty percent of the total bed inventory of Washington County is located in Hagerstown.

5.   Ninety-two percent of the total patient days of Washington County residents in nursing homes were spent in Washington County nursing homes in 1981 while only sixty-eight percent of the total patient days of Frederick County residents in nursing homes were spent in Frederick County nursing homes that year.

6.   Approximately half of the Frederick County residents that received care in another county were served in Washington County nursing facilities.

7.   The 1988 projected percentage of Washington County residents receiving nursing home care who will receive care in their home county, is the highest of all Maryland counties.

8.   The relative numbers of Frederick County residents leaving their resident county to secure nursing home care elsewhere has increased since 1976 despite the goal in the WMHSP of a 0.95 migration factor (only 5% of residents would have to leave the county for nursing home care).

■   Our review of this data convinces us that there was substantial evidence before the agency to support its decision that the Perini proposal was not consistent with the SHP/WMHSP standards.

Further, the 1981 SHP makes it pellucid that the HSP bed need determinations are not static, and provides for consideration of the most current data in evaluating bed need:

"The [Commission] recognize[s] that data by its very nature is time-specific, and for this reason it will require updating from time-to-time.

\*      \*      \*      \*      \*      \*

"[W]hen the SHP and its Revision are used for review or regulatory decisions, the [Commission] will check the data

as presented in the SHP ... against the most current available data—as applicable to the situation. If a significant difference exists, the more current data will be used." Md. State Health Plan, 1981 Revision at I–13.

■ Thus, it is clear the bed need number itself in the SHP is not fixed and may be adjusted if recent demographic evidence suggests such an alteration. Moreover, in *In the Matter of Paint Branch Centre*, Docket No. 82–16–1017 (Dec. 29, 1982), the Commission observed that "[n]eed for services is not based solely on the number derived under availability ... Only when all Plan standards, policies, and objectives are considered together can a determination of need be made." *Id.* at 8.

### COMAR Need Figure

Perini next argues that the Commission erred in justifying its disregard of the SHP/WMHSP bed need methodology by claiming that under COMAR need regulation 10.-24.01.07D(2)(c), the need for the proposed facility must be determined apart from any alloted bed need figure in the SHP/WMHSP. COMAR 10.24.01.07D(2)(c) requires the agency to consider the need of the population to be served or presently being served after examining current demographic and utilization data. Perini insists that the resulting figure under this regulation must be identical to the SHP/WMHSP need figure.

■ We do not agree. Perini's interpretation is contrary to the rules of statutory construction, past Commission interpretation and the interpretation given to similar statutes by other courts.

### —Statutory Interpretation—

A cardinal rule of statutory interpretation provides that where the meaning of a provision is plain, a reviewing court need look no further for explanation. *Blue Cross of Md., Inc. v. Franklin Square Hospital*, 277 Md. 93, 105, 352 A.2d 798 (1976), *remanded for modification; further mod-*

*ified and aff'd as modified, Health Services Cost Review Commission v. Franklin Square Hospital,* 280 Md. 233, 372 A.2d 1051 (1977). Section 19–118(c)(1), *supra,* mandates that except in emergencies, all CON decisions must be consistent with the SHP *and* the standards for review established by the agency. The use of the conjunctive "and" implicates separate need determinations. If the two need determinations were synonomous, there would be no rational explanation as to why the statute directs the Commission to make CON decisions consistent with both the health plans and COMAR. In *Fort Washington Community Hospital, et al. v. Southern Maryland Hospital Center, et al.,* 66 Md.App. 480, 490–91 505 A.2d 117 (1986), *quoting State v. Loscomb,* 291 Md. 424, 432, 435 A.2d 764 (1981), this Court reiterated that

> "[i]t is a general rule of statutory construction that statutes that deal with the same subject matter, share a common purpose, and form part of the same general system are in *pari materia* and must be construed harmoniously in order to give full effect to each enactment."

As we will explain, in order to give full effect to COMAR, COMAR need must mean something other than SHP/WMHSP need.

Perini suggests that the COMAR need determination "is intended to be used to consider special needs *not* addressed by the SHP (Medicaid, minority groups, the handicapped, etc.), and to permit a need analysis to be made *where the SHP provides none.*" (Emphasis in original.) Perini's interpretation renders both the language of § 19–118(c)(1) and COMAR 10.24.01.07D(2)(m) (dealing with the contribution of the project to meeting the needs of the medically underserved groups) superfluous. Although COMAR need includes consideration of the needs of underserved groups, criterion (c) must focus on another aspect besides that of criterion (m). These two regulations deal with the same subject matter and share the common purpose of reasoned health planning. Thus, they "must be construed harmoniously in order to give full effect to each enactment." *Fort*

*Washington Community Hospital, supra* [66 Md.App.], at
491, 505 A.2d 117, *quoting State v. Loscomb, supra* [291
Md.] at 432, 435 A.2d 764.

The purpose behind the need analysis under COMAR
10.24.01.07D(2)(c) is to determine whether the alloted
SHP/WMHSP bed figure best meets the needs of the
specific area and population to be served based on the
available data. The SHP is time-specific. While it is prom-
ulgated every five years and updated periodically, it is not
always timely. COMAR criterion (c) takes into account this
problem by consideration of present and future statistics.

■ Accordingly, in view of the statutory mandate, mere
consistency with the SHP alone is not sufficient to meet an
applicant's burden of proving that its project is needed. If
the SHP bed availability methodology projects a need for
additional resources, but other factors substantially indicate
no such need under COMAR, we hold the Commission must
not ignore that information. Perini's argument eliminates
the Commission's discretion, judgment and expertise, and
instead advocates a mechanical approach to allocating crit-
ical health care services. This pure mathematical formula
produces a sterile bed projection without regard to chang-
ing events in health care delivery.

### —Commission Interpretation—

Our interpretation of COMAR need is also consistent with
past Commission interpretation. Although the Commission
does not routinely come to a decision regarding need which
is in conflict with state or local plans, in those cases where
the evidence demonstrates that real need does not exist, the
Commission has found no need.

In *In the Matter of North Charles General Hospital,*
Docket No. 83–24–1171 and *Sinai Hospital of Baltimore,*
Docket No. 83–24–1172 (November 26, 1984), the Commis-
sion denied a proposed program as not needed under criteri-
on (c) even though the SHP methodology would have al-

lowed the program.[11] Perini attempts to distinguish this case based on the different facility requested, namely an open heart surgery program. We find the distinction without significance.

### —Other Jurisdictions—

Likewise, other courts have held that proposed projects must be consistent with not only the state plans, but also with other criteria; *see Princeton Community Hospital v. State Health Planning Agency*, 328 S.E.2d 164, 170–71 (W.Va.1985); and that health planning agencies cannot solely rely upon a statistical bed projection formula. *See Anderson v. Blum*, 80 A.D.2d 674, 436 N.Y.S.2d 378, 379 (1981); *Irvington General Hospital v. Department of Health of State of New Jersey*, 149 N.J.Super. 461, 374 A.2d 49, 52 (1977); *Fairfield Nursing Home v. Whalen*, 64 A.D.2d 802, 407 N.Y.S.2d 923 (1978).

Turning to the evidence presented relative to COMAR need, the Commission found the population to be served

---

11. The Circuit Court for Baltimore City affirmed that decision. *In the Matter of Sinai Hospital of Baltimore, Inc.* and *North Charles General Hospital*, (Cir.Ct.Blt. City) No. 843550081/CL 28162, (June 19, 1985). Although not authority, we find the following language from that decision explicative:

"Sinai and North Charles argue that the Commission cannot reach a conclusion under the COMAR need review criterion different from that dictated by the need methodology in the SHP. Such an interpretation of the statute, however, renders the COMAR need review criterion surplusage. Although the SHP need methodology is a critical factor in determining need, its analysis is only one aspect of need that the Commission must consider. In view of the Commission's statutory responsibility to determine whether need exists for a proposed health care service, the Commission must utilize other indicators of need in its decision process. If the need methodology indicates a projected need but other factors substantially indicate no such need, the Commission should not be required to close its eyes to that information. Consistency with the SHP is a necessary, but not necessarily a sufficient, condition for receiving a CON and, therefore, meeting the need methodology under the SHP is not conclusive of need." *Id.* at 5.

The circuit court's affirmance is currently on appeal to the Court of Appeals of Maryland, *Sinai Hospital of Baltimore, Inc., et al. v. Maryland Health Resources Planning Commission*, No. 103, September Term, 1985, argued January 8, 1986.

needed fifty additional beds located in Washington County near the jurisdictional boundary with Frederick County. Utilizing the most recent available data, the Commission concluded that the expressed policy in COMAR of striving to keep nursing home patients as close as possible to their families and friends would be thwarted by the addition of 144 beds in Washington County.

Based on this data, the Commission properly determined that the population to be served—Frederick and Washington County residents—would best be served if only fifty beds in Boonsboro were approved. No need was found for the Perini proposal notwithstanding one of the factors considered was the availability figure of 233. "To authorize additional beds, even though there is a projected need for them, would be counter productive if the new beds would be placed in a location already well-served with available beds." *Doctors' Hospital of Prince George's County, supra* [65 Md.App.] at 675, 501 A.2d 1324.

■ In conclusion, we hold there was substantial evidence presented to the Commission to support its finding that Perini's proposal was inconsistent with both the SHP/WMHSP and the COMAR need criteria, and the Commission properly interpreted the governing regulations.

## V. USE OF PROPOSED SHP

Perini argues that the Commission's decision is improper as a matter of law because the Commission utilized the policies enunciated in the proposed SHP prior to the date of its promulgation as a regulation. Perini relies upon a statement in the decision that the proposed SHP provided "... important and relevant information when analyzing need according to COMAR 10.24.01.07D(2)(c)(1983)." Perini also cites to the Commission's admission that the proposed plan "... can and reasonably should, be used when determining the need for the project...." Perini suggests that although the Commission termed the use of the policies as "important and relevant information," implying that the

proposed SHP was not used as a regulation per se, "[i]t is the *effect* of the use of the Proposed SHP, not the label placed upon it by the Commission, that determines whether the Commission based its decision on an invalid rule or regulation...." (Emphasis in original.) To support its position, Perini refers us to *Blue Cross of Maryland, Inc. v. Franklin Square Hospital, supra; Sturman v. Ingraham,* 52 A.D.2d 882, 383 N.Y.S.2d 60 (2d Dept.1976); *Salmon Brook Convalescent Home, Inc. v. Commission on Hospitals and Health Care,* 177 Conn. 356, 417 A.2d 358 (1979); and *Cheshire Convalescent Center, Inc. v. Commission on Hospitals and Health Care,* 34 Conn.Supp. 225, 386 A.2d 264 (1977).

We find no merit to Perini's assertion; nor do we find the authorities cited apposite. Even though we agree that the proposed SHP was not yet legally effective, we do not agree that the Commission based its decision on that law. Let us expound.

*In Franklin Square Hospital, supra,* the Circuit Court for Baltimore County held that guidelines of the Maryland Health Services Cost Review Commission were regulations within the meaning of the APA, and were of no effect since they were not promulgated in accordance with that law. On remand, the Commission was ordered to follow the governing regulations.

In *Sturman v. Ingraham, supra,* while a nursing home construction permit review was pending, the health commissioner announced a program to control nursing care costs and using a guideline in that program, denied the permit. Although the guideline had been adopted it had not yet been filed with the Secretary of State. The Court found the proposed guideline had been applied as a general policy "predetermining ... the application would be denied no matter what its merits." *Id.* at 61.

Similarly, in *Salmon Brook Convalescent Home, Inc., supra,* the Connecticut Supreme Court examined the use of

proposed but not yet promulgated regulations when reviewing a requested rate increase. The Court concluded:

"The commission then has a delegated discretion, which, to be properly exercised, where it has binding consequences, must obey the statutory commands of the [Uniform] APA.... The nature and impact of these 'regulations' characterized as 'guidelines' required that the commission's legislative authority exercised under them be done only after conforming with the [Uniform] APA." *Id.*, 417 A.2d at 362.

Finally, in *Cheshire Convalescent Center, Inc., supra,* the Court concluded that despite the commission's characterization of non-promulgated policies as a guideline, where an agency statement of general applicability implements, interprets or prescribes law or policy, it is a rule which must comply with the APA. *Id.*, 386 A.2d at 270.

These cases do support Perini's assertion that the adoption of an administrative procedure act creates an administrative due process which must be observed before regulations may be used in administrative reviews. This does not imply, however, that the use of current data or the recognition of common policy in a CON decision rises to the level of rule-making.

■ Md. State Gov't.Code Ann. § 10–101(e) (1985 Supp.) defines regulation as "a statement or an amendment or repeal of a statement that ... is in any form, including: (1) a guideline; (2) a rule; (3) a standard; (4) a statement of interpretation; or (5) a statement of policy." Information concerning utilization and demographics compiled in preparation for adopting a new regulation does not meet the definition of a regulation under § 10–101(e), *supra.* Where the current regulations provide for the use of present and future data, as do COMAR 10.24.01.07D(2)(c) and the SHP/WMHSP, we hold the use of such data in a CON review scheme does not amount to rule-making invoking APA procedure.

■ Further, recognition of policies previously adopted pursuant to the APA, and reaffirmed as still necessary in a proposed regulation, does not violate administrative due process.

Perini mischaracterizes the use made by the Commission of the new plan. The Commission did not, as charged by Perini, base its decisions on policies contained in the proposed plan prior to its effective date as a regulation. The agency expressly noted that it could not utilize the policies adopted in the new plan. The Commission instead considered the data collected in preparation of the new plan and considered the common policy goals expressed in *both* the 1981 SHP/1980 WMHSP and the proposed SHP in arriving at its decision:

> "The Commission is currently involved in a unique transition period. [T]he Commission was authorized to develop a new, comprehensive State Health Plan. This massive undertaking has been completed, and the [proposed] State Health Plan has been approved by the Commission.... At this juncture the [proposed] SHP will become effective as a regulation as soon as the statutory rulemaking timeframes pass in approximately two weeks. The 1980 WMHSP finds a need for 233 additional beds in Washington County alone while the [proposed] SHP, finds a need for only 148 beds in the entire HSAWM. In addition, both the 1980 WMHSP and the [proposed] SHP have identified the maldistribution of resources in HSAWM as a problem and contain recommendations to address that problem. Although the [proposed] SHP cannot, at this time, be used to measure a project's consistency with WMHSP criterion 1, standard 1, the Commission in these unique circumstances finds that it can and reasonably should, be used when determining the need for the project according to COMAR 10.24.01.-07D(2)(c)."

In light of our holding that COMAR need criteria may be used to evaluate need of a project independent of the SHP/WMHSP bed need availability, we do not conclude the

Commission improperly utilized both data and common policies in the SHP/WMHSP and the proposed SHP.

### Use of Current Data

■ Perini's challenge ignores a crucial distinction. It fails to recognize the difference between using current available data and the application of a policy. Perini has cited no authority, nor have we unearthed any, which requires that merely because new data is collected and analyzed in the process of drafting a proposed regulation, this information may not be utilized in assessing consistency with current regulations. To hold otherwise would result in health care decisions based on out-dated information. Yet, the health care system does not remain frozen in time as evidenced by the pronouncement that health plans must be promulgated every five years and bolstered by COMAR's need requirement that the Commission analyze present and future utilization and demographic statistics when determining need.

In its reply brief, Perini contends that the "six items of purported new data reviewed by the Commission ... were not, in fact, 'new' at all." This argument places too much emphasis on the word "new". The Commission did not, in its decision or in its brief, ever imply that the data it examined had never been considered prior to Perini's review.[12] It contends only that the most recent available evidence should be considered when evaluating the population's need for a health care facility. Whether the information the Commission examined was available prior to the CON denial in the instant case is of no consequence. It is

---

12. Perini suggests that the 1981 Nursing Home Survey data was available to the Commission at the time of a prior decision in 1983 and that, therefore, the Commission should have then realized the need for more beds in Frederick County. The Commission, however, does assert in a footnote in its brief that the raw data collected for the 1981 Survey was not calculated until January, 1984, nor available for evaluation until then. As we discuss, *infra*, the fact that the information may have been available prior to Perini's review is of no relevance.

the application of the data to meeting the peculiar needs of a given locale that is important, not its date of availability. As we stated, the use of current data ensures that health planning judgments are informed and produce the degree of flexibility required in the ever-changing health care field.

Examining the current data, the Commission concluded Perini's proposal did nothing to alleviate the maldistribution problem recognized in the 1980 WMHSP and 1981 SHP and reiterated in the proposed SHP. The Commission's need analysis utilized data which showed that the approval of another nursing home in Hagerstown would further exacerbate migration and distribution problems previously identified. Maldistribution had been a problem in the Western Maryland area prior to adoption of the 1981 SHP and the 1980 WMHSP, and the data showed these problems had not been corrected in the intervening years before adoption of the proposed SHP. For the Commission to ignore these problems and ignore the data evidencing the continuing presence of these problems would stifle the Commission's use of its own expertise and knowledge.

### Common Policies

Perini argues that the Commission did not use policies common to both the current and proposed SHP. Instead, "it is quite clear that the Proposed SHP sets forth and implements an entirely *new* set of policies with respect to comprehensive care (nursing home) beds to *decrease* the number of beds and to thereby encourage the development of non-institutional services for the elderly." (Emphasis in original.) (Footnote omitted.) Perini suggests the Commission made changes in the adjustment factor and migration factor which, although numerical in nature, represented an actual policy shift away from the current SHP.

It is true the proposed SHP adopted policies intended to decrease nursing home beds. This does not mean that the Commission based its CON decision in the case *sub judice* on these policies. The decision was based on the contribution Perini's project would make towards exacerbat-

ing the maldistribution and out-migration problems. Merely because the same result (denial of CON) is dictated by consideration of two separate policies does not mean that the Commission considered both policies. Nowhere in the Commission's opinion was it suggested that de-institutionalization was even considered, much less factored into the decision.

Further, although the proposed SHP makes significant numerical alterations in the adjustment and migration factors, statistical updating of those factors, or adjustment of those factors to aid in the implementation of current policies, as was done in this case, does not represent a change in policy. Although Perini maintains that the adjustment and migration factors are "not figures that can be varied at whim," but "are the end result of numerous policy factors ... arrived at only after input from statisticians, health planners, health care providers and other interested groups ...," Perini does not refer us to any statutory requirement that these figures must remain constant. In fact, the 1981 SHP provides for adjustment of these factors. The plan specifies that migration patterns must be agreed upon, but recognizes that if changes in these figures are to be made, they must be "justified." Md. State Health Plan, 1981 Revision, Vol. 1–2, LT–40. It is clear justification existed for modification.

In summation, utilizing current data and recognizing the uncorrected problem of migration and maldistribution identified in the 1981 SHP and 1980 WMHSP and reaffirmed in the proposed SHP, the Commission did not err as a matter of law in denying a CON to Perini.

Merely because the approval of the Reeders project is also consistent with policies in the proposed SHP does not mean that those policies were inappropriately utilized to approve either the Reeders project or deny Perini's application.

## VI.  ARBITRARY AND CAPRICIOUS DECISION

Perini also posits that the Commission's interpretation of its regulatory criteria was arbitrary and capricious because it was contrary to Commission precedent.  Perini refers us to three findings of the Commission: 1) finding of no need when the SHP/WMHSP identified a need;  2) finding the "intent" of the travel standard had been violated;  and 3) finding in-migration rather than out-migration was a legitimate concern.

To support its claim, Perini urges us to follow the decision in *North Miami General Hospital, Inc. v. Office of Community Medical Facilities,* 355 So.2d 1272 (Fla.1978).  In that case, the Florida Supreme Court held that an agency that treats similar cases in dissimilar ways, absent a reasonable explanation, acts arbitrarily and capriciously.  We also look to *Aspen Hill Venture v. Montgomery County Council,* 265 Md. 303, 265 Md. 303, (1972), for guidance.  In *Aspen Hill Venture, supra,* the Court of Appeals held that a rezoning denial was improper because it was "patently arbitrary and discriminatory" when it had granted another such rezoning request "on basically the same evidence...." *Id.* at 317, 265 A.2d 303.

■■ What Perini ignores is that the above two decisions ruled agency action arbitrary when cases involved the same set of facts and the same law.  Without the full records presented to the Commission prior to all its decisions, we are unable to determine if Perini's application involves the same set of facts and law.  We venture to say that it does not because of the different locations of various projects, the myriad of community needs, and because the local HSPs all have different standards and criteria germane to their regional health care issues.  Although Perini, in its appendix and extract supplies us with excerpts from past decisions of the Commission, we cannot know the exact contours of the evidence presented.  Hence we cannot determine whether the decision herein was totally inconsistent and therefore arbitrary and capricious. *See Doctors' Hos-*

*pital of Prince George's County, supra* [65 Md.App.] at 680, 501 A.2d 1324.

As we stated, the local HSPs adopt standards and criteria which address purely local problems. The WMHSP naturally adopted criteria relative to the problems of maldistribution of nursing care facilities and skewed migration patterns. Even if we were to examine the complete records in past Commission decisions and conclude the Commission has never before interpreted the regulations in the manner in which they were interpreted in the instant case, given the migration and distribution dilemmas present in the Washington-Frederick County area, it would not necessarily be unreasonable to act as the Commission did here.

Even without the full records, based on the excerpts of the decisions provided to us by Perini, it is apparent the cases are distinguishable. We consider each finding in seriatim.

### Need

Perini again uses the argument of "no need" as a backdrop for its contention that the Commission's decision was contrary to precedent:

> "[T]he Commission's finding of 'no need' when the SHP/HSP clearly identified a need was an abrupt, arbitrary and capricious departure from all prior decisions of the Commission, in which decisions the SHP/HSP bed need figure is synonomous with COMAR D(2)(c) 'need of the population to be served.' "

In light of our holding that COMAR D(2)(c) and SHP/WMHSP bed need are not synonomous and given the fact that the Commission in at least one prior decision has not considered them co-terminous, Perini's challenge as to this aspect is without merit.

### Travel Time

WMHSP criterion 4, standard 1, provides that a proposed facility should be located within sixty minutes driving time from a patient's doctor and family. The Commission found

Perini was inconsistent with the "intent" of the travel time standard despite the fact that the Hagerstown location of its proposed project was within sixty minutes of the service area.

Perini suggests the Commission has never in rendering its decisions looked to the intent of this standard because the meaning is plain. In support, Perini assures us that it has reviewed all Commission decisions made known to it and refers us to five such decisions. In reference to these cases, Perini cites to its appendix filed with the circuit court. In the joint record extract filed on appeal, the parties made reference to the entire six-volume record transmitted by the Commission to the court below. The decisions cited by Perini were not supplied to us in any appendix or record extract filed with this Court other than a mere reference to "see" the circuit court file.

Rule 1028b.1. requires that the record extract contain such parts of the evidence, pleadings or other parts of the record as "may reasonably be necessary for the determination of the questions presented by the appeal...." In *Rosenberg v. Rosenberg,* 64 Md.App. 487, 515 n. 7, 497 *A.*2d 485 (1985), we admonished counsel against attempting to incorporate by reference additional materials filed elsewhere in the case file. In *Anderson v. Department of Health and Mental Hygiene,* 64 Md.App. 674, 686 n. 6, 498 A.2d 679 (1985), *citing Rosenberg, supra,* Judge Wilner writing for this Court noted that "a mere reference to [material filed in the circuit court] does not suffice to present the argument" for our review. Accordingly, Perini's assertion that the Commission has never looked to the intent of travel standard with a mere reference for us to "see" materials filed elsewhere, does not suffice to present the issue for our consideration. It is apparent by Perini's contention that those cited cases are necessary to a resolution of the issue. This Court will not condone manipulation of the rules of appellate practice.

In any event, we find Perini's argument spurious. Its argument ignores the commentary following the standard wherein the 1980 WMHSP specifically states that when applying criterion 4, "[i]mproved geographic distribution of facilities would increase access to long-term care services by consumers...." Thus, following the directives of the local plan, the Commission considered the relationship of the travel time standard to the SHP/WMHSP recognition of maldistribution of nursing homes. In *In the Matter of Paint Branch Centre, supra,* the Commission itself expressed that "it is entirely proper to look beyond the standard to determine how the HSA meant the standard to be applied." *Id.* at 8. In this regard, Perini is incorrect in asserting the meaning of criterion 4 is plain. The discussion under the criterion clarifies that the WMHSP was concerned with maldistribution as it relates to accessibility.

Perini retorts, however, that it is clear the HSA meant the standard to be interpreted literally. Referring to the HSA staff recommendation prepared for Commission review, Perini notes that the HSA found it to be consistent with this criterion because its facility would be located within a sixty-minute radius. Perini's argument does not lead to the conclusion that the Commission's decision was arbitrary and capricious, however. The Commission must consider but is not required to follow the recommendations of the HSA. *See* Md. Health–Gen'l. Code Ann. § 19–118(d), *supra.* (Commission has nondelegable authority to act on CON applications).

The Commission could not shut its eyes to the well-documented problem of maldistribution of facilities within the Washington-Frederick County area. Criterion 4 specifically addressed the problem of maldistribution. It is unclear from the decisions cited by Perini as precedent for its proposition whether the local HSPs involved in those cases were faced with this problem and felt a need to address it. Perini's argument is specious.

## Out-Migration Preference

SHP Standard LT 2b provides:

"Proposals involving [comprehensive care] beds which reduce the need for patients to migrate out of their area of residence shall be preferred over those which do not."

Perini argues that the WMHSA has historically defined "area of residence" as the "county" and concludes that since its project would fill the SHP/WMHSP bed need in Washington County, it will reduce the need for Washington County residents to migrate out of their area of residence for treatment. Perini asserts that "the Commission, in an unprecedented finding, holds Appellant inconsistent because it assumes Appellant's proposed project will contribute to 'in-migration' from Frederick County."

Perini once again forgets that based on the most recent information, there is no need for Washington County residents to migrate out of their area of residence. In fact, the percentage of Washington County residents receiving nursing home care in their home county is the highest of all Maryland counties.

Further, the argument of inconsistency with Commission precedent is unfounded. The Commission similarly interpreted Standard LT 2b in *In the Matter of Paint Branch Centre, supra.* In that case, the Commission found the approval of additional beds in Northern Prince George's County would not address the problem of patients migrating into that area from Washington, D.C. In so finding the Commission noted: "The statements in the [Southern Maryland] HSP relate to patients migrating into Prince George's County, not out of it." *Id.* at 11.

As we have noted, the 1980 WMHSP addresses the problem of patients migrating from Frederick and Allegany Counties into Washington County for care, and the WMHSA itself concluded:

"[A]pproval of some number of beds in Washington County ... will perpetuate to a degree, the need of Frederick County residents to migrate to Washington County and

others for nursing home care.... [A]pproval at a later date of some number of beds in Frederick County instead will help reduce migration *out* of Frederick County and will free-up, over time, beds in Washington County now taken up by Frederick County residents." Health Systems Agency of Western Md., "Staff Summary and Analysis," at 33. (Emphasis in original.)

■■■ Based on recent statistics concerning in-migration and utilization of resources, we cannot conclude the Commission erred in considering in-migration as a factor under this standard.

## VII. POWER TO GRANT A CON

Perini's final assertion is that under 42 C.F.R. § 123.-403(b) (1984) and Md. State Gov't. Code Ann. § 10–215(g), *supra,* reversal of the Commission's decision is permissible. It urges reversal is the only just remedy "since remand at this point, now that the Proposed SHP is effective as a regulation, may simply permit the Commission to accomplish directly what it illegally attempted to accomplish indirectly by its Decision." [13] In light of our holding that the Commission did not err as a matter of law and that its decision was supported by substantial evidence, we will not reverse the Commission's decision nor address whether this Court has the authority to direct the Commission to issue a CON.[14]

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

**13.** In fact, the Perini application was resubmitted as part of another Comparative Review and was denied under the newly approved SHP in a final decision rendered on December 17, 1985. At the same time a new Frederick County facility was approved. *In the Matter of Beverly Place of Frederick, et al.,* Docket No. 85–11–1276.

**14.** Perini does not challenge the granting of a CON to Reeders with conditions. See *Doctor's Hospital of Prince George's County v. Maryland Health Resources Planning Commission,* 65 Md.App. 656, 501 A.2d 1324 (1986). Hence, we need not review that issue.